# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

WALMART INC.,

          Plaintiff,

    v.

JEAN KING, IN HER OFFICIAL CAPACITY
AS CHIEF ADMINISTRATIVE LAW
JUDGE OF THE OFFICE OF THE CHIEF
ADMINISTRATIVE HEARING OFFICER,
ET AL.

          Defendants.

Case No. 6:23-cv-00040-JRH-BKE

## MOTION FOR PRELIMINARY INJUNCTION

Walmart Inc. moves for a preliminary injunction under Federal Rule of Civil Procedure 65.

Without such relief, Walmart faces the irreparable harm of being forced to endure administrative

proceedings conducted by an administrative law judge who is unconstitutionally shielded from the

President's supervision.

June 16, 2023

/s/ Joseph E. Finley
Attorney Bar Number: 261526
JONES DAY
1221 Peachtree St., N.E., Suite 400
Atlanta, GA  30361
(404) 521-3939
jfinley@jonesday.com

Hashim M. Mooppan (pro hac vice pending)
T. Elliot Gaiser (pro hac vice pending)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C.  20001
(202) 879-3939
hmmooppan@jonesday.com

*Attorneys for Plaintiff Walmart Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 3

BACKGROUND ................................................................................................... 4

LEGAL STANDARD ............................................................................................ 5

ARGUMENT ........................................................................................................ 6

I.      WALMART IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM ................................. 6

      A.     Article II Imposes A General Rule That The President Must Have Unrestricted Ability To Remove Executive Officers............................................. 6

      B.     The Supreme Court Has Permitted Only Two Narrow Exceptions To Article II's Requirement Of Unrestricted Removal................................................ 7

      C.     OCAHO's ALJs Are Officers That Fit Neither Of The Narrow Exceptions To Article II's General Rule Of Unrestricted Removal..................................... 10

      D.     This Court May Not And Should Not Recognize A New Exception To Article II's General Rule Of Unrestricted Removal ............................................ 13

      E.     The Proper Remedy Here Is To Enjoin The Pending Adjudications Because The Unconstitutional Removal Restrictions Are Not Severable .......... 17

II.     THE EQUITABLE FACTORS FOR A PRELIMINARY INJUNCTION FAVOR WALMART ............ 22

CONCLUSION.................................................................................................... 24

## INTRODUCTION

Walmart is being subjected to proceedings before an Administrative Law Judge who is doubly insulated from removal by the President.  The DOJ's Office of the Chief Administrative Hearing Officer (OCAHO) is determining whether to impose civil penalties against Walmart for alleged violations of immigration-related recordkeeping requirements (but with no charges that Walmart employed anyone unlawfully).  The ALJ overseeing these proceedings may not be removed by the Attorney General except "for good cause established and determined by the Merit Systems Protection Board."  5 U.S.C. § 7521.  And MSPB members, in turn, may be removed by the President "only for inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 1202.

This scheme violates the Constitution under recent Supreme Court precedent.  "The President's power to remove"—"and thus supervise"—inferior officers within an executive agency must be "unrestricted," with one narrow exception: Congress may impose modest removal protections for those "with limited duties and no policymaking or administrative authority."  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191, 2198-2200 (2020).  But OCAHO's ALJs fall well outside that exception.  For one thing, they hold continuing offices with wide-ranging duties, not temporary or minor positions.  *See generally Lucia v. SEC*, 138 S. Ct. 2044 (2018).  For another, even if one layer of protection for these inferior officers were permissible, the two layers they enjoy is not.  "[S]uch multilevel protection … is contrary to Article II's vesting of the executive power in the President."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484 (2010).  Indeed, the Fifth Circuit recently so held, striking down the SEC's analogous ALJ scheme on just this ground.  *See Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).

The remedy for this unlawful scheme is plain: this Court should enjoin the pending administrative proceedings.  The only alternatives—severing the removal protections for either the

ALJs or the MSPB members—would be improper under settled remedial principles. Making ALJs completely accountable to the President (through his Attorney General) is precisely what Congress designed this adjudicatory scheme to avoid. And allowing the President to fire MSPB members at will would neither solve the problem nor tailor the solution. ALJs have powers far too broad for them to be shielded by even one level of protection, and the MSPB has many other duties (unrelated to ALJ removals) for which it is permissibly protected from removal. The appropriate remedy is thus to halt the proceedings and let Congress—if it chooses—craft a new, valid scheme.

Finally, the remaining preliminary-injunction factors cut decisively in Walmart's favor as well. The twenty unconstitutional proceedings pending against Walmart each threaten the "here-and-now injury" of being forced to proceed before "an unaccountable ALJ," an injury that "cannot be undone" once it has occurred. *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 903-04 (2023). On the other side of the balance, the Government lacks any cognizable interest in carrying out an unconstitutional adjudication, and adjudication of its claims against Walmart is not time-sensitive because it primarily seeks retrospective monetary relief for alleged recordkeeping infractions. This Court should enjoin the OCAHO adjudications against Walmart.

## BACKGROUND

Federal law requires employers like Walmart to verify a new employee's identity and employment eligibility by completing a Form I-9, and then to retain the I-9s for a statutory period. *See* 8 U.S.C. § 1324a(a), (b). In November 2022, U.S. Immigration and Customs Enforcement (ICE), which investigates compliance with these requirements (*see* 8 C.F.R. § 27a.9(b)), informed Walmart that its inspection of 20 Walmart facilities had resulted in 11,103 charged paperwork violations. These charges generally pertain to alleged errors in the electronic systems these

4

facilities use to complete and store employees' I-9s.  ICE did not charge that Walmart employed anyone unlawfully.  Exh. A, Decl. of Daniel Brown ¶¶ 2-4.

Walmart timely sought a hearing to contest the charges.  By statute, that hearing "shall be conducted" by an OCAHO ALJ.  8 U.S.C. § 1324a(e)(3)(B).  ICE filed 20 complaints against Walmart, one for each facility.  Following briefing on Walmart's motions to dismiss, Chief ALJ King (who is handling all 20 cases) authorized the parties to file amended complaints and answers, and Walmart filed renewed motions to dismiss.  ICE's requested relief is $24 million in penalties. Brown Decl. ¶¶ 4-8.  In litigating 20 sets of facility-specific charges, Walmart anticipates significant pre-hearing discovery; under OCAHO regulations, this will resemble the discovery available in federal district court, and ALJ King will exercise broad powers akin to those of a federal district judge.  *See* 28 C.F.R. Part 68; Brown Decl. ¶¶ 10-34.

On June 16, 2023, Walmart filed its Complaint in this Court, alleging that the OCAHO ALJ scheme violates Article II of the Constitution.  *See* Compl. ¶¶ 1-8, 23-27.  Walmart now promptly seeks a preliminary injunction to protect itself from being further subjected to the irreparable harm of proceeding before OCAHO's unconstitutionally insulated ALJs.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish that "it has a substantial likelihood of success on the merits"; that "it will suffer an irreparable injury unless the injunction is granted"; that "the harm from the threatened injury outweighs the harm the injunction would cause the opposing party"; and that "the injunction would not be adverse to the public interest."  *Dream Defenders v. Governor of the State of Fla.*, 57 F.4th 879, 889 (11th Cir. 2023).  "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest."  *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (per curiam).

**ARGUMENT**

I.  **WALMART IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM**

A.  **Article II Imposes A General Rule That The President Must Have Unrestricted Ability To Remove Executive Officers**

As the Supreme Court recently emphasized, the Constitution vests the "entire" power to execute federal law in the President "alone." *Seila Law*, 140 S. Ct. at 2197.  Wielding that power means that the President must have "authority to remove those who assist him" in his task. *Free Enter. Fund*, 561 U.S. at 513-14.  The ability to control his subordinates is necessary for the President to be "fully accountable for discharging his own responsibilities," *id.* at 514, through "a clear and effective chain of command," *id.* at 498.  As a result, the "general rule" is that the President has "unrestricted removal power" over executive officers. *Seila Law*, 140 S. Ct. at 2198.

This rule that the President must have free rein to supervise the officers "who wield executive power on his behalf" stems from the Constitution's text. *Id.* at 2191.  Article II "vest[s]" all of "[t]he executive Power … in a President," and no one else.  Art. II, § 1, cl. 1.  And Article II imposes a corresponding duty on the President to "take Care that the Laws be faithfully executed." *Id.* § 3.  That enormous and exclusive mandate both necessitates subordinate officers to assist the President and requires his unfettered ability to supervise them. *Seila Law*, 140 S. Ct. at 2197.  As Madison put it, the executive power necessarily encompasses "the power of appointing, overseeing, and controlling those who execute the laws."  1 Annals of Cong. 463 (1789).  That supervisory "power, in turn, generally includes the ability to remove executive officials," because it is only the person "that can remove" such officials who they "must fear and, in the performance of their functions, obey." *Seila Law*, 140 S. Ct. at 2197 (cleaned up).

The Constitution has been understood this way "[s]ince 1789." *Id.* at 2198.  In creating the seminal executive departments, the First Congress settled that the President must have "power to remove—and thus supervise—those who wield executive power on his behalf." *Id.* at 2191-92. And nearly a century ago, the Supreme Court confirmed in a landmark opinion that the President's "control of those executing the laws" includes the "essential" "power of … removal." *Myers v. United States*, 272 U.S. 52, 117, 163-64 (1926).  As the Court recently reaffirmed, *Myers* recognized that, if it were otherwise, the President's task "to take care that the laws be faithfully executed" would not simply be more time-consuming or more complicated—it would be "impossible." *Seila Law*, 140 S. Ct. at 2198.

### B.  The Supreme Court Has Permitted Only Two Narrow Exceptions To Article II's Requirement Of Unrestricted Removal

The Supreme Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 140 S. Ct. at 2192.  One applies to certain principal officers, whose direct superior is the President himself; and the other applies to certain inferior officers, who are "directed and supervised at some level by" principal officers.  *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1980 (2021); *see Seila Law*, 140 S. Ct. at 2199 n.3 (describing these categories).  The two narrow exceptions represent "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 140 S. Ct. at 2199-2200.  And so the Supreme Court has repeatedly invalidated removal restrictions that exceed these limits.

*First*, as to principal officers, the Supreme Court has allowed Congress to limit the President's removal power only for those who head "multimember expert agencies that do not wield substantial executive power." *Id.* at 2199-2200.  In *Humphrey's Executor v. United States*, the Court considered the five-member FTC, which it viewed to be a nonpartisan "administrative

body" that exercised "quasi judicial and quasi legislative" functions, not any pure executive function. 295 U.S. 602, 624 (1935). In that context, the Court held that Congress could forbid the President from removing FTC Commissioners absent "inefficiency, neglect of duty, or malfeasance in office." *Id.* at 620, 628. In *Wiener v. United States*, the Court relied on *Humphrey's Executor* to uphold a similar removal standard for the War Claims Commission. 357 U.S. 349 (1958). That intentionally short-lived multi-member entity—which adjudicated claims for compensation arising from World War II—was likewise viewed as not being "part of the Executive establishment." *Id.* at 350, 354-56.

In the years since *Humphrey's Executor* and *Wiener*, however, the Supreme Court has invalidated restrictions on the removal of principal officers who do not fit within the mold of those cases. In particular, twice in the past three years, the Court invalidated removal restrictions insulating single-headed agencies that wield substantial executive powers. *Seila Law*, 140 S. Ct. at 2192 (Consumer Financial Protection Bureau); *Collins v. Yellen*, 141 S. Ct. 1761, 1783-84 (2021) (Federal Housing Finance Agency). Similarly, DOJ *itself* has concluded that President Biden could fire the Commissioner of the Social Security Administration appointed by President Trump, reasoning that this office likewise fell outside the narrow confines of *Humphrey's Executor*. *See* 45 Op. O.L.C. __, __ (2021), 2021 WL 2981542, at *7-9.

*Second*, as to inferior officers, the Supreme Court has allowed Congress to limit the President's removal power only for those "with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2200. In the late 19th century, the Court upheld a rule preventing the Secretary of the Navy from discharging a naval cadet-engineer during peacetime without first finding misconduct or convening a court-martial. *United States v. Perkins*, 116 U.S. 483 (1886). And a century later, the Court upheld a "good cause" restriction on the

Attorney General's ability to remove an independent counsel tasked with the narrow purview of investigating and prosecuting, pursuant to DOJ policy, certain senior officials' alleged crimes. *Morrison v. Olson*, 487 U.S. 654, 691-92 (1988).  In addition to the limited scope of these offices, the removal restrictions were relatively modest.  In *Morrison*, the Court observed that the Attorney General could remove the counsel for misconduct.  *Id.* at 692; *see also id.* at 724 n.4 (Scalia, J., dissenting) (explaining that "*cause*" for removing an inferior officer "would include, of course, the failure to accept supervision").  And in *Perkins*, although the Court did not opine on the standard for misconduct (because the cadet-engineer had not engaged in *any* wrongdoing), the military context made clear that insubordination would be an offense punishable by removal (or worse). *Cf. Free Enter. Fund*, 561 U.S. at 507 ("Military officers are broadly subject to Presidential control through the chain of command and through [his] powers as Commander in Chief.").

Here too, the Supreme Court has invalidated removal restrictions for inferior officers that do not fit the mold of the "limited restrictions" in *Perkins* and *Morrison*.  *Id.* at 495.  In *Free Enterprise Fund*, there were two removal restrictions in play: The parties agreed that the President could not remove SEC Commissioners without cause (as defined in *Humphrey's Executor*), and the SEC in turn could not remove members of the Public Company Accounting Oversight Board unless the SEC found—"on the record" "after notice and opportunity for a hearing"—that the Board member had "willfully violated" the Sarbanes-Oxley Act, had "willfully abused" his or her authority, or had "failed to enforce compliance" with public accounting standards "without reasonable justification or excuse."  *Id.* at 486-87.  The Court held that this "novel" statutory scheme violated Article II.  *Id.* at 496.  The "added layer of tenure protection" withdrew "from the President any decision" on whether there was cause to remove a Board member, creating "a Board that is not accountable to the President, and a President who is not responsible for the Board."  *Id.*

at 495.  And the problem was exacerbated because the Board exercised "substantial executive authority" but enjoyed "unusually" robust removal protection even from the SEC, through the Act's "sharply circumscribed definition" of cause.  *Id.* at 503, 505.  The Court thus invalidated the Board's protection from removal.  *Id.* at 492.

### C.    OCAHO's ALJs Are Officers That Fit Neither Of The Narrow Exceptions To Article II's General Rule Of Unrestricted Removal

Under the principles above, the removal scheme at issue here is unconstitutional twice over. The *two* restrictions on the President's power to remove OCAHO ALJs violate *Free Enterprise Fund*, and even just one restriction *for ALJs* would violate *Seila Law*, because they have broader offices and removal protections than the officers in *Perkins* and *Morrison*.

To begin, the ALJ presiding over ICE's administrative cases against Walmart is indisputably an inferior officer.  The Supreme Court has held that SEC ALJs are officers, as they have continuing offices and exercise significant, important discretion in overseeing adversarial proceedings.  *Lucia*, 138 S. Ct. at 2053-54.  DOJ itself has acknowledged that, under *Lucia*, *all* agencies' ALJs are officers, because they "preside over adversarial administrative proceedings and possess the adjudicative powers highlighted" in that case.  Mem. from the Solicitor Gen., U.S. Dep't of Justice, to Agency Gen. Counsels, Guidance on ALJs After *Lucia v. SEC* (S. Ct.) (July 2018); *see A.S. v. Amazon Web Servs., Inc.*, 14 OCAHO no. 1381h, 2 n.4 (2021) (Chief Administrative Hearing Officer so concluding for OCAHO ALJs).  And OCAHO ALJs are *inferior* officers, because "superior executive officer[s]"—up through the Attorney General—may generally "review" their final orders.  *See Arthrex*, 141 S. Ct. at 1981; 8 U.S.C. § 1324a(e)(7); 28 C.F.R. §§ 68.53, 68.55.  Thus, they do not qualify for the *Humphrey's Executor* exception for *principal* officers heading certain multimember agencies.

The question then becomes whether OCAHO's ALJs qualify for the *Perkins/Morrison* exception for certain inferior officers; otherwise, the general rule applies that the President must be able to remove them at will (through his Attorney General).  And the answer is that OCAHO's ALJs fall outside the narrow exception, for two reasons.

*First*, unlike in *Perkins* or *Morrison*, two levels of good-cause removal restrictions obstruct the President's control of OCAHO ALJs.  Under 5 U.S.C. § 7521, the Attorney General may not remove the ALJs except for "good cause" as "established and determined" by the MSPB, which has made clear that it reaches "the final decision on good cause" *and* the "appropriate penalty." *See SSA v. Glover*, 23 M.S.P.R. 57, 60 n.1, 64 (1984); *see also* 5 C.F.R. § 1201.140(b).  Yet the President lacks unrestricted power to remove MSPB members—they can be fired "only for inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. § 1202, the same restrictive standard involved in *Humphrey's Executor* and *Seila Law*.  *See Seila Law*, 140 S. Ct. at 2206-07. As in *Free Enterprise Fund*, then, these "dual for-cause limitations" on removal unconstitutionally "withdraw from the President any decision on whether … good cause exists" to remove an ALJ, depriving him of "the ability to oversee the [ALJs], or to attribute [their] failings to those whom he *can* oversee."  561 U.S. at 492, 495-96.

Moreover, atypically robust removal restrictions apply to ALJs, just as they did to the Board members in *Free Enterprise Fund*.  The MSPB does not necessarily treat misconduct, poor performance, or failure to follow lawful directions as good cause for removing an ALJ.  To the contrary, the MSPB has made it difficult to impose any discipline at all in some such circumstances.  *See, e.g.*, *SSA v. Goodman*, 19 M.S.P.R. 321, 331 (1984) (declining to authorize discipline for ALJ with well below-average productivity, as there was no evidence that the ALJ's docket was average).  And even when the MSPB *has* found that an ALJ engaged in misconduct, it

has often refused to authorize removal as the appropriate punishment. *See, e.g.*, *SSA v. Brennan*, 27 M.S.P.R. 242, 248, 251 (1985), *aff'd*, 787 F.2d 1559 (Fed. Cir. 1986) ("disruptive conduct" did not warrant removal); *Glover*, 23 M.S.P.R. at 80 ("intemperate" statements to supervisor did not warrant removal).  All this means that the President may wish to remove an OCAHO ALJ but cannot do so because the decision rests with the MSPB—whose members, again, may reject the President's views about removable offenses, *see Seila Law*, 140 S. Ct. at 2206-07.  This double restriction on removal tramples Article II.

Indeed, the Fifth Circuit recently reached that exact conclusion, holding (in the context of the SEC's ALJs) that these "[t]wo layers of for-cause protection" are unconstitutional.  *Jarkesy*, 34 F.4th at 463.  As here, under 5 U.S.C. §§ 1202 and 7521, the SEC's "ALJs can only be removed … if good cause is found by the [MSPB]," and "MSPB members can only be removed by the President for cause," which renders the ALJs "sufficiently insulated from removal that the President cannot take care that the laws are faithfully executed."  *Jarkesy*, 34 F.4th at 464-65.

*Second*, even setting aside the restriction on the President's ability to remove members of the MSPB, the "good cause" restriction on removing OCAHO ALJs is unconstitutional on its own.  These ALJs' "duties" are not "limited" either in authority (like the naval cadet-engineer's duties in *Perkins*) or in duration and scope (like the independent counsel's duties in *Morrison*).  *Seila Law*, 140 S. Ct. at 2199-2200.  On the contrary, OCAHO ALJs remain in their roles indefinitely, and they exercise sweeping investigatory and enforcement powers over private parties engaged in adversarial adjudications under 8 U.S.C. § 1324a.  Indeed, while the *Perkins/Morrison* exception applies only to inferior officers with "no policymaking … authority," *Seila Law*, 140 S. Ct. at 2200, DOJ *itself has admitted* that ALJs "determine, on a case-by-case basis, the policy of an executive branch agency."  Sec'y of Educ. Review of ALJ Decisions, 15 Op. O.L.C. 8, 15 (1991).

The Supreme Court has never countenanced removal restrictions for inferior officers with such broad powers and such indefinite tenure.  For good reason, as this scheme "blur[s] the lines of accountability" required under Article II.  *Arthrex*, 141 S. Ct. at 1982; *accord Free Enter. Fund*, 561 U.S. at 497.  OCAHO's ALJs need not "obey" the Attorney General because they know that he "can[not] remove" them.  *Seila Law*, 140 S. Ct. at 2197.  But it is the Attorney General, and ultimately the President, who will naturally be held responsible by the public for the actions of inferior officers *within DOJ*.

In short, insulating the ALJs from removal confuses the constitutional design that "[t]he buck stops with the President," *Free Enter. Fund*, 561 U.S. at 493, and his "*alter ego*," the Attorney General, *Myers*, 272 U.S. at 133.  And the problem is exacerbated as cause for their removal is determined by the MSPB—another agency that the President is responsible for but cannot control.

### D.  This Court May Not And Should Not Recognize A New Exception To Article II's General Rule Of Unrestricted Removal

Despite all this, the Ninth Circuit has held that a similar ALJ scheme within the Department of Labor does not violate the Constitution.  *See Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1133 (9th Cir. 2021).  That court did not dispute that DOL ALJs fall outside the two exceptions that the Supreme Court has recognized.  Instead, it concluded that, all things considered, the President "ha[d] sufficient control over DOL ALJs to satisfy the Constitution."  *Id.*  That conclusion is both wrong and immaterial.  Lower courts may not craft new exceptions to the President's general power to remove executive officers; and even if they could, the reasons that *Decker Coal* gave for doing so contradict Supreme Court precedent and are inapplicable to OCAHO ALJs regardless.

Start with the power to create new exceptions.  The Supreme Court could not have been clearer that the "general rule" is "the President's unrestricted removal power."  *Seila Law*, 140 S.

Ct. at 2198.  Nor could it have been clearer that the "two exceptions" constitute the "outermost" incursions on the general rule.  *Id.* at 2199-2200.  If the Supreme Court wishes to recognize more, it must be the one to do so, for "it is [that Court's] prerogative alone to overrule one of its precedents."  *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).  *Decker Coal* did not recognize (let alone refute) this point, or even acknowledge *Seila Law*'s general rule.  *See* 8 F.4th at 1131, 1135-36 (erroneously distinguishing *Seila Law* as a case only about a "principal officer").  In all events, the specific reasons that *Decker Coal* gave for its newly minted exception are flawed on their face.

*Decker Coal* mainly relied on the "purely adjudicatory function" performed by DOL ALJs. 8 F.4th at 1133 (citing *Free Enter. Fund*, 561 U.S. at 507 n.10 (reserving this question)).  Again, though, DOJ itself has already admitted that ALJs do *not* exercise "purely" adjudicatory functions, because their decisions "determine … policy" for their agencies.  *See supra* at 12.  And regardless, "adjudicative bod[ies]" within the Executive Branch "exercise[] Executive authority" when they conduct those adjudications.  *Kuretski v. Comm'r*, 755 F.3d 929, 932, 944 (D.C. Cir. 2014).  After all, "under our constitutional structure[,]" ALJs "*must* be exercis[ing] … the 'executive Power,'" even when their "activities take … 'judicial' forms," because they lack Article III's protections for judges exercising "judicial power."  *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013) (emphasis added).  Thus, like the administrative patent judges in *Arthrex*, "[w]hile the duties of [ALJs] partake of a Judiciary quality as well as Executive, [ALJs] are still exercising executive power and must remain dependent upon the President."  141 S. Ct. at 1982 (cleaned up).

Nor is there anything unusual about executive officers subject to presidential removal performing adjudicative roles.  Such adjudications have occurred "since the beginning of the Republic."  *See City of Arlington*, 569 U.S. at 305 n.4; *see also, e.g.*, Harold J. Krent, *Presidential Control of Adjudications Within The Executive Branch*, 65 Case W. Reserve L. Rev. 1083, 1089-

90 (2015) (describing adjudication of pension claims by the Secretary of War in the late-18th and early-19th centuries).  Indeed, the APA generally authorizes agency heads *themselves* to conduct adjudications without using ALJs, 5 U.S.C. § 556(b), though Congress specifically deprived the Attorney General of that power in this statutory context, 8 U.S.C. § 1324a(e)(3)(B).

For these reasons, executive adjudication, like all Executive Branch functions, "now wields vast power and touches almost every aspect of daily life, heighten[ing] the concern that it may slip from the Executive's control, and thus from that of the people." *Free Enter. Fund*, 561 U.S. at 499.  That concern is especially pronounced here, where independent ALJs have been placed *within* an Executive Branch agency subject to the Attorney General's nominal control.  That combination illustrates the "diffusion of accountability" that occurs "[w]ithout a clear and effective chain of command," *id.* at 497-98; and it also puts beyond dispute that ALJs "are part of the Executive establishment," rather than a stand-alone adjudicatory body whose tasks purportedly "require absolute freedom from Executive interference," *Wiener*, 357 U.S. at 354.  Indeed, in the seminal *Myers* decision, the Supreme Court emphasized that the President must be able to "consider [a] decision after its rendition as a reason for removing" an officer with "quasi-judicial" duties, to ensure that the "discretion regularly entrusted to that officer" has not been "[un]intelligently or [un]wisely exercised." 272 U.S. at 135.  Simply put, ALJs are not exempt from the Supreme Court's recognition that "[o]ne can have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts." *Free Enter. Fund*, 561 U.S. at 499.[1]

---

[1] In further contrast to *Decker Coal*, which involved the awarding of government benefits, the adjudications here seek to impose civil penalties—a particularly "daunting" exercise of executive power. *See Seila Law*, 140 S. Ct. at 2200-01.

*Decker Coal* also justified its new exception on the grounds that the Benefits Review Board (whose members serve at the Labor Secretary's pleasure) had after-the-fact ability to "overturn an ALJ's decision," which the court characterized as a form of "meaningful control over DOL ALJs." 8 F.4th at 1134-35.  But the Supreme Court has expressly rejected this theory.  In *Free Enterprise Fund*, the Court explained that the SEC's "[b]road power over [the subordinate] Board['s] functions"—to "approve the Board's budget," "issue binding regulations," "relieve the Board of authority," "amend Board sanctions," or even "enforce Board rules on its own"—was no "substitute" for removal "authority over [the Board's] members."  561 U.S. at 504.  And *Seila Law* reiterated that rejection.  140 S. Ct. at 2207.  *Decker Coal* simply ignored all this.[2]

Finally, *Decker Coal* reasoned that, under the statutory scheme at issue there, whether to use ALJs in the first place was a decision that "Congress left … to the DOL … if it desires," which the court reasoned meant that the President had merely chosen to "tie[] his own hands" by letting the Labor Department use ALJs.  8 F.4th at 1133-34.  Contrary to the court's suggestion, however, *Free Enterprise Fund* squarely held that "the separation of powers does not depend" on whether "the encroached-upon branch approves the encroachment."  561 U.S. at 497.  While the President "can always choose to restrain himself in his dealings with subordinates" in the sense of *deferring* to their choices, he cannot "escape responsibility for his choices" by delegating power to officers whom he cannot remove.  *Id.*  In all events, the governing statute here *does* mandate the use of

---

[2] Again in further contrast to *Decker Coal*, back-end review by an officer accountable to the President is even more attenuated here than it was there: OCAHO's ALJs are supervised by the Chief Administrative Hearing Officer, who is supervised by the Director of the Executive Office for Immigration Review, who is at last supervised the Attorney General.  *See* 28 C.F.R. §§ 68.54-68.55.  Unlike the Benefits Review Board in *Decker Coal*, the two intermediate supervisors in this statutory scheme do *not* serve at their agency head's pleasure, as they are members of the Senior Executive Service with civil-service protections.  *See* 5 U.S.C. § 3132(a)(2); 28 C.F.R. §§ 0.115, 0.118, 68.2; 5 C.F.R. Part 359.

ALJs: A party who wishes to stave off an "[o]rder for civil money penalt[ies] for paperwork violations" must "request[]" "a hearing respecting the violation," and that hearing "shall be conducted before an administrative law judge."  8 U.S.C. § 1324a(e)(3)(A), (B).  Even under the Ninth Circuit's misguided reasoning, therefore, "Congress has … tied the President's hands and hindered his control over his subordinates." *Decker*, 8 F.4th at 1133.

### E.     The Proper Remedy Here Is To Enjoin The Pending Adjudications Because The Unconstitutional Removal Restrictions Are Not Severable

When confronted with unconstitutional removal restrictions, courts must conduct a severability analysis to determine the "appropriate remedy." *Seila Law*, 140 S. Ct. at 2207.  Under severability principles, the proper remedy here is to enjoin OCAHO's administrative proceedings. That approach honors the essential role that the dual removal restrictions play in this particular administrative scheme far better than the alternative of severing either restriction.

The "inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress" if the invalid portion alone is voided.  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).  Under this approach, a statute "cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall." *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924).  In other words, even if the statute would be "fully operative" without the unconstitutional provisions, courts still cannot sever them if "rewrit[ing] [the] statute" this way would "give it an effect altogether different from that sought by the measure viewed as a whole." *Murphy v. NCAA*, 138 S. Ct. 1461, 1482 (2018).  Otherwise courts risk "mak[ing] a new law, not … enforc[ing] an old one," thereby "substitut[ing] the judicial for the legislative department of the government." *United States v. Reese*, 92 U.S. 214, 221 (1875).  In short, "a

17

court cannot use its remedial powers to circumvent the intent of the legislature." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (cleaned up).

In this case, Congress's intent is clear. "The substantial independence that the Administrative Procedure Act's removal protections provide to administrative law judges is a central part of the Act's overall scheme." *Lucia*, 138 S. Ct. at 2060 (Breyer, J., concurring in the judgment in part). Before 1946, ALJs (called "hearing examiners" at the time) were "employees of an agency" under the Classification Act of 1923. *Ramspeck v. Fed. Trial Examiners Conf.*, 345 U.S. 128, 130 (1953) (citing 5 U.S.C. § 661 *et seq.*). "[T]heir classification was determined by the ratings given them by the agency, and their compensation and promotion depended upon their classification." *Id.* This dependence produced "[m]any complaints" that "they were mere tools of the agency concerned and subservient to the agency heads." *Id.* at 131. This was seen as incompatible with the "independent judgment" necessary for a "fair and competent hearing." *Butz v. Economou*, 438 U.S. 478, 513-14 (1978).

In enacting the APA in 1946, "Congress intended to make hearing examiners 'a special class of semi-independent subordinate hearing officers' by vesting control of their compensation, promotion and tenure in the Civil Service Commission." *Ramspeck*, 345 U.S. at 132. As a result, until 1978, ALJs were "removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission." Administrative Procedure Act, Pub. L. No. 79-404, § 11, 60 Stat. 237 (1946). But the members of the Civil Service Commission were removable at will by the President. *See* 5 U.S.C. § 632 (1946).

Then, in 1978, Congress replaced the Civil Service Commission with three agencies: the Office of Personnel Management, the Federal Labor Relations Authority, and the MSPB. *See* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 1202(d), 92 Stat. 1111. In doing so,

Congress sought to "confer upon [MSPB] members a tenure akin to that of the Federal judiciary." Civil Service Reform: Hearings on H.R. 11280 Before the H. Comm. on Post Off. & Civ. Serv., 95th Cong. 824 (1978); *see* 5 C.F.R. § 1200.1 ("The Merit Systems Protection Board (the Board) is an independent Government agency that operates like a court.").  To that end, the Act provided that members of the MSPB "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office," 5 U.S.C. § 1202(d), while maintaining that an agency may remove an ALJ "only for good cause established and determined by the [MSPB]," 5 U.S.C. § 7521(a). Thus, from 1978 forward, Congress imposed the double layer of for-cause removal protection that now shields ALJs (including OCAHO's) from presidential control.

This history proves that Congress considered both removal restrictions—the one shielding ALJs from removal by their agency heads, and the one shielding MSPB members from removal by the President—essential to the statutory scheme.  Congress insisted that ALJs be free from the criticism that these neutral adjudicators are "mere tools" of their political superiors, and it demanded that members of the MSPB have an independence "akin" to that of federal judges.  It is little surprise, then, that the Civil Service Reform Act of 1978 lacks a severability clause instructing courts to save whatever they can if one or both of these key removal restrictions falls. *See* Pub. L. No. 95-454.  Indeed, the only other remedial possibilities—"tamper[ing] with" one of the restrictions, *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1995)—would rewrite Congress's carefully crafted scheme beyond recognition.

As just explained, severing the restriction preventing an agency head from removing ALJs at will would turn them back into the agency foot-soldiers that the APA eliminated precisely to ensure fair and competent agency adjudications.  And while that is true of ALJs generally, it is *especially* true of OCAHO's.  Again, while the decision whether to use an ALJ is ordinarily a

discretionary decision vested in the agency head under the APA, 5 U.S.C. § 556(b), Congress expressly mandated that OCAHO "shall" use ALJs to conduct the civil-penalty adjudications at issue here, 8 U.S.C. § 1324a(e)(3)(B).  Congress thus purposefully interposed an independent ALJ between the Attorney General and the civil penalties he may seek to impose.

Particularly given that unusual choice, rather than having this Court make OCAHO's ALJs removable at the Attorney General's whim, Congress would evidently prefer to adopt its own constitutionally acceptable solution to the problem—such as requiring an enforcement suit in federal court, or creating a standalone adjudicative body like the War Claims Commission in *Weiner*.  In fact, the statutory history confirms that conclusion.  When Congress decided "to render examiners independent and secure in their tenure and compensation," S. Rep. No. 79-752 (1945), granting them for-cause protection within their own agencies was just one of "[s]everal proposals" that it considered, and others included using a "completely separate 'examiners' pool'" or subjecting agency decisions to a special court's jurisdiction.  *See Ramspeck*, 345 U.S. at 132 n.2. It is clear that Congress would have turned to one of those alternate proposals rather than return to the days where "neutral" adjudicators were subject to the agency head's plenary control.

Severing the removal protections shielding members of the MSPB would be even more inappropriate.  To begin, that would not cure the scheme's constitutional infirmities.  OCAHO's ALJs exercise too much power for too long a time to be shielded by even one level of removal protection, *see supra* at 12-13; allowing the President to fire at will members of the MSPB does not address that independent flaw.  Moreover, severing this restriction would not "limit the solution to the problem" to be remedied.  *Free Enter. Fund*, 561 U.S. at 508.  In keeping with *Weiner*, the insulated members of the MSPB perform a host of adjudicatory duties beyond determining whether ALJs were properly removed.  *See, e.g.*, 5 C.F.R. §§ 1201.1-1201.3 (appeals from civil-service

employment disputes; trials of personnel actions brought by the Office of Special Counsel).  It thus would be radically overbroad to give the President plenary control over everything within the MSPB's jurisdiction simply because of the small sliver of ALJ-removal cases it hears.

In sum, unlike in other severability cases involving removal restrictions, this is not a situation in which "Congress, faced with the limitations imposed by the Constitution, would have preferred" an officer "removable at will" to "no [officer] at all."  *Seila Law*, 140 S. Ct. at 2209 (quoting *Free Enter. Fund*, 561 U.S. at 509).  Rather, this case is more like *Murphy*, where remedying the constitutional problem with ALJs' removal protections by making them removable at will "would have seemed exactly backwards" "to the Congress[es] that adopted" the APA and Civil Service Reform Act of 1978.  138 S. Ct. at 1483.

For these reasons, the least disruptive remedy—and the only one within the competence of the Judicial Branch—is an injunction halting OCAHO's administrative proceedings against Walmart.  As the removal restrictions are not severable, OCAHO's ALJs lack the constitutional authority to act.  *Cf. Collins*, 141 S. Ct. at 1788 & n.23.  And injunctive relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally."  *Free Enter. Fund*, 561 U.S. at 491 n.2.  To "limit[]" Walmart's remedy "to the inadequacy that produced [its] injury," *Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022), this Court therefore should enjoin the proceedings against Walmart, not "blue-pencil" essential removal protections out of Congress's carefully chosen ALJ scheme, *Free Enter. Fund*, 561 U.S. at 509.

All that said, if the Court disagrees that enjoining the proceedings is the appropriate remedy for OCAHO's unconstitutional structure, Walmart alternatively requests that the Court declare that OCAHO's ALJs are removable at will by the Attorney General and enjoin any application of their

removal protections.  In no circumstance should the clear constitutional flaws in OCAHO's scheme go unremedied while Walmart remains subject to the proceedings.

## II.   THE EQUITABLE FACTORS FOR A PRELIMINARY INJUNCTION FAVOR WALMART

Without a preliminary injunction, Walmart will be irreparably harmed.  Indeed, the Supreme Court already said as much.  In *Axon*, the Court addressed whether parties raising the same challenges to ALJs (at the FTC and SEC) had to raise those challenges after the administrative process had concluded, or instead could immediately file suit in federal court to halt the process.  143 S. Ct. at 897.  In holding that they could go directly to court, the Supreme Court reasoned that "having to appear in proceedings before an unconstitutionally insulated ALJ" itself constitutes a "here-and-now injury." *Id.* at 903.  It also explained that such an injury "is impossible to remedy"—in other words, is *irreparable*—"once the proceeding is over"; after all, "[a] proceeding that has already happened cannot be undone." *Id.* at 904.  Like the challengers in *Axon*, Walmart faces the irreparable injury of having to defend itself in unconstitutional agency proceedings—and it faces that harm twenty times over.

The irreparable harm from these unconstitutional agency adjudications is exacerbated by the way they will proceed.  Absent an injunction, Walmart will face an expensive pre-hearing discovery process—including depositions, interrogatories, document production, and property and premise inspections, *see* Brown Decl. ¶ 12-34; 28 C.F.R Part 68—with no prospect of recovering those costs from the Government even if Walmart prevails on its claims (here or there). *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).  Forcing Walmart to absorb those unrecoverable costs as a tax from OCAHO's unconstitutional administrative process adds irreparable insult to injury.

Finally, the balance of the equities and the public interest also favor Walmart's request for injunctive relief.  The Government suffers no cognizable harm from halting "the perpetuation of unlawful agency action," *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and the public interest is always "served when constitutional rights are protected," *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).  The scope of relief at issue in the adjudications also mitigates any arguable harm the Government may assert.  ICE primarily seeks to collect backward-looking monetary penalties for the alleged recordkeeping infractions.  Brown Decl. ¶¶ 3-4.  Thus, once a constitutionally proper mechanism for assessing the penalties has been adopted, ICE can resume its efforts to prove that it is entitled to them.

To be sure, ICE also *claims* that it is entitled to a "cease-and-desist order" concerning the alleged recordkeeping infractions.  Brown Decl. ¶ 6.  But the statute authorizes ALJs to issue such orders only for unlawful hiring, recruiting, or retention of individuals who are ineligible to work— none of which Walmart has been charged with—*not* mere paperwork violations.  *Compare* 8 U.S.C. § 1324a(a)(1)(A), (a)(2), (e)(4), *with id.* § 1324a(a)(1)(B), (b), (e)(5).  Moreover, where, unlike here, an employer is charged with ongoing unlawful employment practices, the statute authorizes the Attorney General to seek injunctive relief *in federal court*, *id.* § 1324a(f)(2), and Walmart's claim here would not affect that authority.  In all events, any delay in ICE's ability to obtain prospective relief for alleged paperwork infractions does not come close on the equitable balance to outweighing Walmart's "here-and-now injury" from "having to appear in proceedings before an unconstitutionally insulated ALJ." *Axon*, 143 S. Ct. at 903.

**CONCLUSION**

This Court should enjoin Defendants from proceeding with the OCAHO adjudications pending against Walmart.

June 16, 2023                                      Respectfully submitted,

                                                  /s/ Joseph E. Finley
                                                  Attorney Bar Number: 261526
                                                  JONES DAY
                                                  1221 Peachtree St., N.E., Suite 400
                                                  Atlanta, GA  30361
                                                  (404) 521-3939
                                                  jfinley@jonesday.com

                                                  Hashim M. Mooppan (pro hac vice pending)
                                                  T. Elliot Gaiser (pro hac vice pending)
                                                  JONES DAY
                                                  51 Louisiana Ave., N.W.
                                                  Washington, D.C.  20001
                                                  (202) 879-3939
                                                  hmmooppan@jonesday.com

                                                  *Attorneys for Plaintiff Walmart Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I am counsel to Plaintiff; on June 16, 2023, I filed the foregoing using ECF and, consistent with FRCP 4(i), caused the same to be served to the following by registered or certified mail:

Office of the Chief Administrative Hearing Officer
5107 Leesburg Pike, Ste. 2500   Falls Church, VA  22041

U.S. Department of Justice
950 Pennsylvania Ave, NW   Washington, DC  20530

Civil Process Clerk, U.S. Attorney's Office for Southern District of Georgia
22 Barnard St., Ste. 300   Savannah, GA  31401

U.S. Immigration and Customs Enforcement
500 12th St., SW, Mailstop 5900   Washington, DC  20536

                                                  /s/ Joseph E. Finley