**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**

**Walmart Inc.,**

      *Plaintiff,*

        v.

**Jean King, in her official capacity as Chief Administrative Law Judge of the Office of the Chief Administrative Hearing Officer,** *et. al.,*

      *Defendants.*

Civil Action No. 23-cv-00040-JRH-BKE

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

1

## INTRODUCTION

Almost half a century ago, Congress enacted limits on the President's ability to remove Administrative Law Judges ("ALJs") from office. Under the relevant statutory scheme, ALJs can be removed by the head of their employing agency only when the Merit Systems Protection Board ("MSPB") finds "good cause" for removal, *see* 5 U.S.C. § 7521, and MSPB members in turn can be removed by the President only for cause. Plaintiff Walmart Inc.—which is subject to administrative proceedings before a Department of Justice ("DOJ") ALJ over alleged violations of the Immigration and Nationality Act ("INA")—now urges this Court to hold those longstanding removal limits unconstitutional, and to preliminarily enjoin the ALJ proceedings against Plaintiff on that basis. Plaintiff, however, cannot satisfy the demanding requirements for such relief, and the Court should deny its Motion for a Preliminary Injunction.

At the outset, Plaintiff can show neither that it is suffering the type of irreparable harm necessary for emergency relief nor that the balance of harms favors that relief. Plaintiff's suit arises out of civil penalties that the Department of Homeland Security ("DHS") seeks to impose on Plaintiff for alleged INA violations, for which Plaintiff has sought review before a DOJ ALJ. But those administrative proceedings themselves will cause Plaintiff no irreparable harm: as one of the largest multinational companies in the world (and the largest private employer in the United States), it can hardly claim that the costs and burdens of litigation before an ALJ warrant the extraordinary relief it seeks here. Lacking any such argument for irreparable harm, Plaintiff instead suggests that it is irreparably harmed simply by having to proceed before an ALJ protected by allegedly unconstitutional removal protections. But that contention fares no better. The Eleventh Circuit has stated that an alleged constitutional violation, in itself, does not necessarily amount to irreparable harm sufficient for preliminary relief. Plaintiff has thus failed to establish any material,

irreparable harm meriting emergency relief. By contrast, Plaintiff's requested relief—an order enjoining administrative proceedings—would impose a clear burden on Defendants, interfering with the law enforcement efforts of the Executive Branch.

Nor can Plaintiff show any likelihood of success on the merits of its claim. Plaintiff claims that the "dual layer" statutory removal protections applicable to ALJs are unlawful because, in its view, Congress can impose *no* limit on the President's ability to remove ALJs and that, even if certain limits are permissible, "dual layers" of protection are not. That argument is incorrect, and would not warrant injunctive relief in any event.

To begin, the Supreme Court has repeatedly made clear that Congress may restrict the President's ability to remove adjudicatory officers, and the ALJ at issue here is undoubtedly an adjudicatory officer. She does not, and cannot, initiate investigations, bring enforcement actions, or enact regulations. She simply resolves disputes as a neutral arbiter, with powers limited to those necessary to perform that function. Likewise, the "dual layers" of removal provisions are lawful. Plaintiff's legal theory relies on the Supreme Court's decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), but that case does not apply here. The Supreme Court held that the dual layer removal restrictions at issue there were problematic because they shielded an agency that wielded significant enforcement power—the agency could launch investigations, bring charges, and issue binding rules on an entire industry—and because the removal restrictions included an unusually stringent removal standard. Neither circumstance is present here. The ALJ at issue cannot initiate investigations or enforcement actions, nor can she publish rules regulating an industry. And the ALJ is protected by a standard "good cause" removal provision. For these reasons, the Ninth Circuit recently rejected an identical challenge to ALJ removal protections in *Decker Coal Company v. Pehringer*, 8 F.4th 1123 (2021).

Further, even were the Court to conclude that Plaintiff's legal theory has merit, it should construe section 7521 in a manner that resolves the alleged constitutional defect. In particular, section 7521 can be interpreted so that the Attorney General would generally have discretion in deciding whether to remove ALJs within the DOJ, and the MSPB would have only a limited role in reviewing the evidence supporting the Attorney General's decision. This reading would spare the Court from having to unnecessarily find a statutory provision unconstitutional.

But even if the Court concludes that section 7521 cannot be given an alternative interpretation, and that Plaintiff is likely to succeed on the merits of its claim, the Court should not enjoin any administrative proceedings. Instead, it should do what the Supreme Court has done in recent cases involving challenged removal restrictions: sever the offending restrictions. When a court finds a statutory provision to be unconstitutional, the court must presumptively sever that provision and leave the statute otherwise intact if it can function independently. Here, even without removal protections, ALJs could still hear and resolve disputes. The remainder of the ALJ statutory scheme could still function. To argue otherwise, Plaintiff notes that Congress instituted the ALJ removal restrictions to protect ALJ independence and argues that this somehow means Congress would have wanted to discontinue ALJ proceedings altogether if those restrictions did not exist. The Supreme Court, however, has recently made clear that unless a statute includes an *express* nonseverability clause—and the statute at issue here does not—courts should not conduct a factual inquiry to determine what Congress would have done if the unconstitutional portion of the statute did not exist. Instead, courts must simply presume severability, and then sever the problematic provision if the remainder of the statute can function. Regardless, although Congress sought to protect ALJ independence, that does not mean it would have preferred *no administrative proceedings* over proceedings overseen by ALJs with fewer removal protections. Plaintiff,

unsurprisingly, offers no concrete evidence to support that bold assertion. Given the disruptive consequences of eliminating administrative proceedings—nearly 2,000 ALJs across the federal government adjudicate claims based on a number of statutes—it is more likely that Congress would have preferred to retain those proceedings.

The Court should deny Plaintiff's motion for preliminary relief, or at most should issue a narrow declaration in lieu of Plaintiff's requested injunction.

<u>**BACKGROUND**</u>

1.  There are roughly 2,000 ALJs across the federal government who hear claims relating to a host of federal statutes. *See* U.S. Office of Personnel Management, Administrative Law Judges https://www.opm.gov/services-for-agencies/administrative-law-judges/#url=By-Agency (accessed June 22, 2023). Relevant here, among those ALJs are four who serve in the Office of the Chief Administrative Hearing Officer within the U.S. Department of Justice (hereafter, the "DOJ ALJs"). ALJs may generally be removed "by the agency in which the [ALJ] is employed only for good cause established and determined by the [MSPB]." 5 U.S.C. § 7521(a). MSPB members, in turn, "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

2.  The DOJ ALJs hear claims relating to three provisions of the Immigration and Nationality Act ("INA"), including 8 U.S.C. 1324a. *See* 28 C.F.R. § 0.118. That provision requires, among other things, that companies ensure that new employees complete employment eligibility verification forms ("I-9 forms"). *See id.* §§ 1324a(1)(B); 1324a(b)(2); 8 C.F.R. § 274a.2(a)(2). Those companies, in turn, must retain those I-9 forms and make them available for inspection by certain federal authorities, including DHS, *see* 8 U.S.C. § 1324a(b)(3), which is responsible for enforcing section 1324a. *See* 8 U.S.C. § 1324a(e)(2); 6 U.S.C. § 251(4); 8 U.S.C. § 1103(a)(1).

DHS can investigate potential section 1324a violations, *see* 8 U.S.C. § 1324a(e)(2), and impose monetary penalties, *see id.* § 1324a(e)(4)-(6).

3.   If a penalized company requests a hearing, the matter is assigned to a DOJ ALJ, *see id.* §§ 1324a(e)(3)(A), (B), whose powers are limited to those necessary to facilitate the hearing. The DOJ ALJ can manage the hearing schedule, manage discovery, issue subpoenas, and ultimately issue a merits decision. *See id.* § 1324a(e)(2)(A)-(B); 1324a(e)(3)(C); 28 C.F.R. § 68.28(a). DOJ ALJs do not initiate their own investigations or bring charges for violations of any statute. Their role is purely adjudicatory. *See* 5 U.S.C. § 554(d)(2); 28 C.F.R. § 68.31 ("No officer . . . engaged in the performance of investigative or prosecutorial functions in connection with any proceeding shall, in that proceeding or a factually related proceeding, participate or advise in the decision of the [ALJ], except as a witness or counsel in the proceedings.").

Further, once a DOJ ALJ has issued its decision, that decision is not necessarily final. The Chief Administrative Hearing Officer can review and modify that decision (and any interlocutory orders). *See* 8 U.S.C. § 1324a(e)(7); 28 C.F.R. § 68.53; *id.* § 68.54. In addition, the Attorney General—who is removable by the President at will—can also intervene and modify the DOJ ALJ's decision. *See* 8 U.S.C. § 1324a(e)(7); 28 C.F.R. § 68.55.

4.   In 2021, DHS issued twenty Notices of Intent to Fine ("NIFs") seeking to impose monetary penalties on Plaintiff Walmart Inc. for violations of section 1324a. *See* Brown Decl. ¶ 2. On November 8, 2022, Plaintiff requested a hearing on those NIFs before a DOJ ALJ. *See id.* ¶ 6. Now, roughly six months after requesting administrative proceedings, Plaintiff asks this Court to enjoin them, arguing that the DOJ ALJ overseeing the proceedings is insulated by unconstitutional removal protections. *See* ECF No. 7 ("PI Motion"). Plaintiff challenges no other part of the statutory scheme governing those administrative proceedings.

## STANDARD OF REVIEW

"A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).[1] "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). "The grant of a preliminary injunction is the exception rather than the rule" and "[i]t is not enough that the chance of success on the merits be better than negligible." *State of Fla. v. Dep't of Health & Hum. Servs*., 19 F.4th 1271, 1286 (11th Cir. 2021).

## ARGUMENT

I.   **The Court need not resolve the constitutional questions raised by Plaintiff's motion because Plaintiff cannot establish irreparable harm sufficient for emergency relief, nor does the balance of the equities favor that relief.**

Plaintiff has not established any irreparable harm meriting preliminary relief. First, Plaintiff claims that it will incur "litigation expenses" if the pending administrative proceedings continue. *See* PI Mot. at 22. But "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974). And this is especially so for a multinational corporation like Plaintiff.

Plaintiff also claims that simply having to proceed before an ALJ protected by allegedly unconstitutional removal protections constitutes "irreparable harm." *See* PI Mot. at 22. The Eleventh Circuit, however, has already rejected the argument that "a violation of constitutional

---

[1] Internal citations and quotation marks are omitted through this brief unless otherwise stated.

7

rights always constitutes irreparable harm" warranting a preliminary injunction. *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000). It has noted that "[t]he only areas of constitutional jurisprudence where [the court has] said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims," *Id.* at 1178, and no such claims are at issue here. The constitutional violation alleged by Plaintiff thus does not by itself constitute irreparable harm meriting a preliminary injunction. *Cf. John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1135 (D.C. Cir. 2017) ("In the absence of "immediate or ongoing harm stemming from the [Bureau's] alleged constitutional defects," the "violation of separation of powers" by itself is not invariably an irreparable injury.").

Plaintiff relies on *Axon Enterprise, Inc. v. Federal Trade Commission*, where the Supreme Court stated that "being subjected to unconstitutional agency authority" was "a here-and-now injury" that could not be "remed[ied] once the proceeding [was] over." 143 S. Ct. 890, 903 (2023). In *Axon*, however, the Court merely held that, in light of that injury, a district court may have jurisdiction to hear constitutional challenges to administrative review schemes that would otherwise be channeled away from district court review. *See id.* at 897. But the Court never stated that that injury would merit *emergency relief* from a district court. Indeed, in *Collins v. Yellen*, it implied the opposite, noting that allegedly unconstitutional removal restrictions do not necessarily justify relief "void[ing]" any action taken by an official protected by those restrictions. 141 S. Ct. 1761, 1787 (2021). The Court noted that a plaintiff asserting a removal claim could be "entitle[d] to . . . relief" if it demonstrated that, but for the challenged removal restrictions, the proceedings would have unfolded in a manner more beneficial to the plaintiff. *Id.* at 1788-89. Here, Plaintiff does not even allege that the ALJ proceedings at issue here will unfold differently absent the ALJ removal restrictions. Thus, Plaintiff has failed to establish the requisite irreparable harm.

8

By contrast, Plaintiff's requested injunction would certainly interfere with federal law enforcement efforts. The federal government has an interest in enforcing federal laws, and an injunction against an ongoing proceeding would necessarily interfere with that interest. *Cf. Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 747 n.14 (1983) ("the Federal Government has" a "strong interest in enforcing the federal labor laws"); *Miranda v. Garland*, 34 F.4th 338, 364 (4th Cir. 2022) ("Congress has repeatedly shown that it considers immigration enforcement . . . to be a vital public interest"). That interference would be especially acute here given that pursuing charges before a DOJ ALJ is the only mechanism DHS is currently aware of for meaningfully enforcing several INA provisions. *See* Aguilar Decl. ¶¶ 7-12. Accordingly, the balance of the equities counsels against Plaintiff's requested relief.

## II.     Plaintiff is unlikely to succeed on the merits of its Article II claim.

Article II grants the President the power to appoint "lesser officers," and "[t]hat power . . . includes the ability to remove" those officers. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020). "[T]he President's power to remove Government officials," however, is "not all-inclusive in respect of civil officers." *Morrison v. Olson*, 487 U.S. 654, 687 (1988); *Seila Law*, 140 S. Ct. at 2198 (the Supreme Court has "previously sustained congressional limits on [the President's removal] power"). "The analysis contained in [the Supreme Court's] removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President, but to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison*, 487 U.S. at 689. "Whether the power of the President to remove an officer shall prevail over the authority of Congress to . . . preclude[e] a removal except

for cause will depend upon the character of the office."[2] *Humphrey's Ex'r v. United States*, 295 U.S. 602, 631 (1935). Additionally, courts must "generally presume statutes to be constitutional," *United States v. Davila-Mendoza*, 972 F.3d 1264, 1269 (11th Cir. 2020), and thus, to the extent there is any uncertainty, the Court should err in favor of finding the removal restrictions at issue here to be permissible.

Plaintiff claims that the removal protections for all of the roughly two thousand ALJs are unconstitutional based on two theories. First, Plaintiff claims that the Constitution requires that the President have the right to remove ALJs at will. Second, Plaintiff claims that even if Congress may restrict the President's power to remove ALJs, the dual for-cause protections here are unconstitutional under the Supreme Court's decision in *Free Enterprise*. Neither theory has merit.

A. Congress may restrict the President's ability to remove ALJs.

Plaintiff argues that ALJs—adjudicators entrusted to render impartial decisions in administrative proceedings—cannot be shielded by any removal protections. Plaintiff's theory flouts clear Supreme Court precedent. As Plaintiffs assert, and Defendants do not dispute here, DOJ ALJs are "inferior officers" under Article II, and with respect to "'inferior' executive officials," there is "no specific constitutional impediment to congressionally imposed restrictions on the President's removal powers." *Morrison*, 487 U.S. at 689 n.27. The Supreme Court has noted that Congress may restrict the President's ability to remove "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2200.

---

[2] Plaintiff implies that, in *Seila Law*, the Supreme Court narrowed the circumstances in which Congress may restrict a President's removal power. *See* PI Mot. at 6-9. But there, the Supreme Court explicitly stated that it was not "revisit[ing] *Humphrey's Executor* or any other precedent" on the President's removal power. *Seila Law*, 140 S. Ct. at 2206; *see also id.* at 2192 ("we . . . do not revisit our prior decisions allowing certain limitations on the President's removal power").

Under this standard, Congress can extend removal protections to adjudicatory officers. *See Morrison*, 487 U.S. at 690-91 (With respect to a "quasi-judicial" agency, it will not be "essential to the President's proper execution of his Article II powers that [the agency] be headed up by individuals who were removable at will."). "At least in regard to . . . quasi-judicial" officers, the "authority of Congress . . . to require them to act in discharge of their duties independently . . . includes, as an appropriate incident, power to . . . forbid their removal except for cause." *Id.* at 687; *see also id.* at 691 n.30 (removal restrictions for those performing "quasi-judicial" functions may be appropriate, in part because in those "circumstances . . . Congress might be more inclined to find that a degree of independence from the Executive, such as that afforded by a 'good cause' removal standard, is necessary to the proper functioning of the agency or official").

Here, Congress may lawfully restrict the President's ability to remove DOJ ALJs. Those ALJs perform only adjudicatory functions. They cannot initiate investigations or bring enforcement actions. *See supra* at 6. They do not enact rules or regulations. *See id.* Rather, they preside over hearings as neutral arbiters, with powers limited to those necessary to fulfill that role. *See id.*; *Free Enter.*, 561 U.S. at 507 n.10 ("many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions."); *Ramspeck v. Fed. Trial Examiners Conf.*, 345 U.S. 128, 130 (1953) ("hearing examiners"—the precursors to modern ALJs—were "quasi-judicial officers"). And they only hear claims over three statutory provisions. *See supra* at 5. Further, as Plaintiff acknowledge, ALJs are supposed to have limited independence, *see* PI Mot. at 18-19, and thus the "authority of Congress . . . to require [ALJs] to act in discharge of their duties independently . . . includes, as an appropriate incident, power to . . . forbid their removal except for cause." *Morrison*, 487 U.S. at 687.

11

In response, Plaintiff refers to a quote from *Myers v. United States* stating that the President may have reason for "removing [an] officer" of "a quasi-judicial character." 272 U.S. 52, 135 (1926); *see also* PI Mot. at 15. But later, "in *Humphrey's Executor*," the Supreme Court "explicitly disapproved the expressions in *Myers* supporting the President's inherent constitutional power to remove members of quasi-judicial bodies." *Wiener v. United States*, 357 U.S. 349, 352 (1958). The Supreme Court explained that "the narrow point actually decided [in *Myers*] was only that the President had power to remove a postmaster of the first class"—whose role was "restricted to . . . executive functions"—and that "expressions" in *Myers* that "are beyond the point involved . . . do not come within the rule of stare decisis." *Humphrey's Executor*, 295 U.S. at 626-27. In *Morrison*, the Supreme Court further clarified that "[c]ontrary to the implication of some dicta in *Myers*, the President's power to remove" is "not all-inclusive" and that there are "'quasi-judicial' agencies" Congress may protect from removal.[3] *Morrison*, 487 U.S. at 687.

Plaintiff then argues that even if ALJs play an adjudicatory role, they are still part of the executive branch and thus use executive power. *See* PI Mot. at 14. Again, the Supreme Court has already addressed this argument, noting that it "has never held that the Constitution prevents Congress from imposing limitations on the President's power to remove *all* executive officials simply because they wield 'executive' power." *Id.* at 690 n.27 (emphasis in original); *see also id.* n.29 (rejecting the argument "that every officer . . . exercising any part of [the executive] power

---

[3] In *Jarkesy v. S.E.C.*, the Fifth Circuit addressed the Supreme Court's disavowal of *Myers*' dicta by noting that, in *Seila Law*, the Supreme Court "narrowed" *Humphrey's Executor*. 34 F.4th 446, 464 n.19 (2022). But the Supreme Court disavowed *Myers*'s dicta in *Morrison* and *Wiener* as well. *See supra.* Regardless, the Supreme Court did not "narrow[]" *Humphrey's Executor*. It did the opposite: it explicitly stated it was preserving *Humphrey's Executor* and other removal precedents. *See supra* at 10 n.2. And even assuming the Supreme Court narrowed *Humphrey's Executor*, it never stated that it was repudiating the part of the *Humphrey's* opinion disavowing *Myers*'s discussion of quasi-judicial officers.

must . . . be removable . . . at will."). Indeed, if the use of "executive power" were sufficient to preclude limits on a President's removal authority, it is unclear how any Executive Branch official could be shielded from removal. Thus, the question is not whether an entity uses "executive power," but whether, in using that power, it performs an executive function for which removal restrictions would be improper. *See supra* at 9-10. And as noted above, removal restrictions for those performing adjudicatory functions are not improper. *See supra* at 11.

Plaintiff then asserts that the DOJ has "admitted that ALJs determine, on a case-by-case basis, the policy of an executive branch agency,'" quoting from a 1991 Office of Legal Counsel ("OLC") opinion. PI Mot. at 12 (*quoting* 15 Op. O.L.C. 8, 15 (1991)). That opinion addressed ALJ proceedings concerning a statutory provision administered by the Secretary of Education, and appeared to make the unremarkable point that those ALJ determinations—like many judicial decisions—could have policy consequences. *See* 15 Op. O.L.C. at 15. That does not make ALJs "policymakers" any more than judicial review (which also has policy consequences) makes federal judges "policymakers." The OLC opinion appeared to recognize this, noting in a footnote that "[t]he functions of ALJs . . . can also be understood as 'quasi-judicial' in nature." *See id.* at 15 n.14. And regardless of how that OLC opinion is read, Defendants' position here is that the DOJ ALJs at issue are not policymakers.

Accordingly, consistent with clear Supreme Court precedent, Congress may limit the President's power to remove DOJ ALJs.

B.  *Free Enterprise*'s holding on dual for-cause removal protections does not apply to ALJs.

Plaintiff argues that dual for-cause removal protections for DOJ ALJs are impermissible under *Free Enterprise*. That decision, however, turned on unique factors not present here, and the Supreme Court went out of its way to suggest that its reasoning likely would not apply to ALJs.

*Free Enterprise* addressed removal restrictions applicable to the Public Company Accounting Oversight Board ("PCAOB"), which "govern[s] an entire industry." *Free Enter.*, 561 U.S. at 485; *see also id.* at 508 (the PCAOB "is the regulator of first resort and the primary law enforcement authority for a vital sector of [the] economy"). The PCAOB has the power to, for example, (i) issue binding rules "regulat[ing] every detail of an accounting firm's practice," the violation of which would constitute "a federal crime," (ii) "enforc[e]" several laws, including "the securities laws" and "the [Securities and Exchange Commission's ("SEC's")] rules," by initiating "disciplinary proceedings," (iii) and "initiate[] formal investigations." *Id.* Thus, the PCAOB is "empowered to take significant enforcement actions" and to do so "largely independently." *Id.* at 504.

At the same time, PCAOB members could be removed by the SEC only in certain limited circumstances, and it was assumed that SEC Commissioners in turn could be removed by the President only for cause. *See id.* at 486. But the removal standard applicable to PCAOB members was not an "'ordinary' dual for-cause standard," but a "rigorous" and "unusually high" one: members could not "be removed except for willful violations of the [Sarbanes-Oxley] Act, [PCAOB] rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance." *Id.* at 502-03. The SEC lacked the "power to fire [PCAOB] members for violations of other laws," which the Court found concerning because "[t]he President might have less than full confidence in, say, a Board member who cheats on his taxes; but that" would not be "grounds for removal." *Id.* The Court noted that, if the President believed this standard was met but the SEC disagreed, the standard was so stringent that the President likely could not find that the SEC erred to an extent meriting the removal of an SEC Commissioner. *See Id.* at 496 ("even if the President disagrees with" the SEC's determination on whether the good cause standard is met, the President is generally "powerless to intervene."). The removal restrictions thus "withdr[ew] from the

President any decision on whether . . . good cause exists." *Id.* at 495. The Court therefore found that the PCAOB's "highly unusual" removal restrictions were unconstitutional because they (1) applied to officers with "substantial executive authority," and (2) "protected" the PCAOB with "two layers of for-cause removal—including at one level a sharply circumscribed definition of what constitutes 'good cause.'" *Id.* at 505. Yet the Court "did not broadly declare all two-level for-cause protections for inferior officers unconstitutional." *Decker Coal*, 8 F.4th at 1132.

None of those material circumstances exists here. First, by contrast to PCAOB members, DOJ ALJs do not have "substantial executive authority." They cannot (i) issue any rules governing an industry, (ii) initiate any disciplinary proceedings, or (iii) initiate any investigations into potential violations of federal law. *See supra* at 6. They perform a purely adjudicatory role, with powers incidental to that role. *See id.* Indeed, the Supreme Court suggested that much in *Free Enterprise*. After clarifying that its holding did "not address" those "who serve as administrative law judges," it emphasized that "unlike members of the [PCAOB], many administrative law judges of course *perform adjudicative rather than enforcement or policymaking functions.*" *Id.* at 507 n.10 (emphasis added). Even more, when *Free Enterprise* was before the D.C. Circuit, then-Judge Kavanaugh noted in his dissent: "ALJs perform only adjudicatory functions that are subject to review by agency officials, and that arguably would not be considered 'central to the functioning of the Executive Branch' for purposes of the Article II removal precedents." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J. dissenting), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010). To show otherwise, Plaintiff merely asserts that DOJ ALJs "exercise sweeping investigatory and enforcement powers." PI Mot. at 12. Plaintiff, however, does not elaborate on this, and for good reason: the DOJ ALJs *cannot* initiate any investigations or enforcement actions. *See supra* at 6.

15

Further, unlike PCAOB members, who could be removed only in a few discrete circumstances, ALJs are protected by a standard for-cause removal restriction. ALJ removals are allowed for "good cause," 5 U.S.C. § 7521(a), a term not given any statutory definition, much less one that is "sharply circumscribed," *see Soc. Sec. Admin. Dep't of Health & Hum. Servs. v. Glover*, 23 M.S.P.R. 57, 76 (1984) ("Congress did not intend to exclude any particular category of cases from consideration under 5 U.S.C. § 7521."); *Soc. Sec. Admin. v. Mills*, 1996 WL 812639 (M.S.P.B. Nov. 21, 1996) ("Congress explicitly declined to define the phrase 'good cause'" in section 7521), *aff'd*, 124 F.3d 228 (Fed. Cir. 1997).

And in practice, the MSPB has interpreted "good cause" broadly. *See Abrams v. Soc. Sec. Admin.*, 703 F.3d 538, 543 (Fed. Cir. 2012) (deferring to MSPB's interpretation of "good cause" in section 7521, which "includ[es] all matters which affect the ability and fitness of the ALJ to perform the duties of office"). For example, "good cause" may be found based on (i) "adjudicatory errors," *Soc. Sec. Admin., Off. of Hearing & Appeals v. Anyel*, 1993 WL 244051 (M.S.P.B. June 25, 1993), (ii) deficient "performance, including performance during the course of an adjudicatory proceeding," *id.*, (iii) inappropriate "actions taken by [an ALJ] in the course of an adjudicatory proceeding," *Soc. Sec. Admin. Dep't of Health & Hum. Servs. v. Glover*, 23 M.S.P.R. 57, 76 (1984), (iv) "insubordinate and unreasonable refusal to carry out [an ALJ's] primary function of hearing and deciding cases," *Soc. Sec. Admin., Dep't of Health & Hum. Servs. v. Manion*, 19 M.S.P.R. 298, 303 (1984), (v) "failure to follow instructions," *Abrams*, 703 F.3d at 543, and even (vi) abuse of "free mail privileges," because it is "unlawful" and "call[s] into question [the ALJ's] qualifications to serve in a judicial role," *Soc. Sec. Admin. v. Burris*, 1988 WL 122632 (M.S.P.B. Nov. 3, 1988), *aff'd sub nom. Burris v. Soc. Sec. Admin., Dep't of Health & Hum. Servs.*, 878 F.2d 1445 (Fed. Cir. 1989). Thus, unlike with the PCAOB, it appears that "cheat[ing] on . . . taxes"

16

*could* provide good cause for removing an ALJ. Critically, the Supreme Court itself suggested that ALJ removal restrictions are meaningfully distinct from those applicable to the PCAOB. *See Free Enter.*, 561 U.S. at 506 ("the employees referenced by the dissent" do not "enjoy the same significant and unusual protections . . . as members of the [PCAOB]"); *see also id.* at 536 (Breyer, J. dissenting) (referencing "administrative law judge[s]"); *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2061 (2018) (Breyer, J. concurring in part) (the "*Free Enterprise Fund* Court" stated that "[ALJs] were distinguishable from the [PCAOB] members" because many "perform adjudicative . . . functions" and they do not "enjoy the same significant and unusual protections").

Plaintiff tries to avoid that conclusion by suggesting that in practice, the MSPB applies "good cause" strictly. *See* PI Mot. at 11-12. But none of the three MSPB decisions Plaintiff relies on for that proposition actually helps it. *See id.* In *Social Security Administration ("SSA") v. Goodman*, the MSPB reiterated that "poor performance or . . . misconduct" can "establish[] good cause." 19 M.S.P.R. 321, 328 (1984). Although the MSPB also found that the ALJ productivity statistics "offered [there] did not prove the agency's charge" of poor performance, *id.* at 330-31, the Federal Circuit later stated that, in *Goodman*, the MSPB had set an unduly high evidentiary standard, *see Shapiro v. Soc. Sec. Admin.*, 800 F.3d 1332, 1337 (Fed. Cir. 2015) ("[T]o the extent *Goodman* requires some type of heightened evidentiary proof before an agency can rely upon comparative production statistics to prove good cause for removal, we decline to follow it."). And in Plaintiff's other two proffered MSPB cases, the MSPB in fact found good cause for discipline, and authorized a lesser penalty than removal based on a finding of unique mitigating factors. In *SSA v. Brennan*, the MSPB found good cause to discipline an ALJ because he had engaged in "disruptive" office behavior, but did not uphold removal because he had "served as an [ALJ] for some nine years without incident and during the time in question he[] was experiencing some

nagging physical ailments." 27 M.S.P.R. 242, 251 (1985), *aff'd sub nom. Brennan v. Dep't of Health & Hum. Servs.*, 787 F.2d 1559 (Fed. Cir. 1986). Similarly, in *SSA v. Glover*, the MSPB acknowledged that the ALJ had made comments toward a supervisor that were "intemperate," "ill-considered," and "wholly unbecoming of . . . an [ALJ]," thus "warrant[ing] severe discipline." 23 M.S.P.R. 57, 80 (1984). The MSPB, however, authorized a lesser penalty than removal because the "flare-ups occurred on two consecutive days while the office was in the process of adjusting to . . . a new management system" that "resulted in problems," and a witness for the agency "testified . . . that she had never otherwise heard [the ALJ] 'get upset over things' and that he" was "generally [one of ] the 'most calm' in the office." *Id.* at 79-80. Thus, these cases do not show that the MSPB applies the "good cause" standard narrowly, much less that the standard is as "rigorous" and "unusually high" as the one that applied to the PCAOB. *Free Enter.*, 561 U.S. at 503.

Accordingly, the good cause removal restrictions applicable to DOJ ALJs do not offend separation of powers principles because those ALJs (i) do not wield "substantial executive authority," and (ii) are not protected by a "sharply circumscribed definition of . . . 'good cause.'" *Id.* at 505. *Free Enterprise* thus does not apply here. The Ninth Circuit recently reached that very conclusion in *Decker Coal*. There, the petitioner challenged a Department of Labor ALJ order, arguing, like Plaintiff here, that ALJ removal protections "infringe[] upon the President's inherent Article II removal power by . . . insulating ALJs from termination through two levels of 'for-cause' employment protection." *Decker Coal*, 8 F.4th at 1126. The court rejected this argument, first noting that "the ALJ . . . was performing a purely adjudicatory function." *Id.* at 1133. It went on: "[u]nlike PCAOB members, who exercise policymaking and enforcement functions, an ALJ cannot sua sponte initiate investigations or commence a . . . case" under the relevant statute. *Id.* The court also explained that "the difference between" the "broad 'good cause'" standard

18

applicable to ALJ removals "and the 'unusually high' removal restrictions" that protected the PCAOB "are also significant." *Id.* at 1135. The court then stated that, unlike the PCAOB, which the Supreme Court said presented a "new situation" with "no basis in history," there "is a long history of adjudication by ALJs free from political influence." *Id.* at 1136. All of these conclusions apply equally here.[4]

Plaintiff cites to *Jarkesy*, where a Fifth Circuit panel, over a dissent from Judge Davis, found the removal protections for SEC ALJs to be unlawful under *Free Enterprise*.[5] The court's discussion on this point spanned only a few paragraphs, and its reasoning is refuted by Judge Davis's panel dissent and Judge Haynes' dissent from the denial of rehearing en banc, 51 F.4th 644, 646-47 (5th Cir. 2022). The court, for example, relied on *Lucia v. S.E.C.*, where the Supreme Court found SEC ALJs to be "inferior officers." *Jarkesy*, 34 F.4th at 464. But as Judge Davis noted, *Free Enterprise* did not forbid dual for-cause removal limits for all inferior officers. *Id.* at 477 (Davis, J. dissenting) (in *Free Enterprise*, "the Court did not simply conclude that because members of the PCAOB were 'Officers' . . . dual for-cause protections were unconstitutional"). To the contrary, *Free Enterprise* calls for an analysis of the specific powers of the inferior officer at issue and the nature of the "good cause" limits involved. *See supra* at 13-15. Judge Davis also pointed out that *Lucia* could not be read to cast doubt on ALJ removal restrictions since the Supreme Court there "expressly declined to decide whether multiple lawyers of statutory removal restrictions on SEC ALJs violate Article II." *Jarkesy*, 34 F.4th at 476 (Davis, J. dissenting).

---

[4] Plaintiff asserts that *Decker Coal* "did not dispute" that ALJ removal restrictions fall outside the removal restriction categories previously blessed by the Supreme Court. *See* PI Mot. at 13. That is incorrect. *Decker Coal* relied on multiple precedents, including *Morrison*, where the Supreme Court stated that removal restrictions for adjudicatory bodies may be permissible. 8 F.4th at 1133.

[5] The Supreme Court has granted certiorari in *Jarkesy*. *See* No. 22-859, 2023 WL 4278448 (U.S. June 30, 2023).

The Fifth Circuit also stated that ALJs have meaningful authority. *See id. at 464*. But again, as Judge Davis noted in dissent, "unlike the PCAOB members who determine policy and enforce laws, SEC ALJs perform solely adjudicative functions," and "*Free Enterprise* stated, albeit in dicta, that the fact that an ALJ performs adjudicative . . . functions may justify multiple layers of removal protection." *Id.* at 477 (Davis, J. dissenting). Accordingly, *Decker Coal*, and not *Jarkesy*, should guide the Court's decision here.[6]

C. <u>If the Court finds that Plaintiff's legal theories likely have merit, it should construe section 7521 in a manner that resolves the alleged constitutional defect.</u>

Finally, any alleged constitutional defect can be resolved by construing section 7521 to mean that the Attorney General—who is removable at will by the President—may decide whether there is good cause for removing an ALJ, with the MSPB's role in "establish[ing] and determin[ing]" good cause limited to reviewing whether the evidence supports that determination. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937) (a court's "plain duty is to adopt" a saving construction of a statute to "avoid a serious [constitutional] doubt"). Thus, the MSPB would make only factual findings; it would not second-guess the Attorney General's discretionary judgment that the facts constitute good cause for removal. This would address any alleged constitutional defect, since the MSPB would be performing a role similar to the one Article III courts often perform when reviewing an executive officer's removal. *See United States v. Perkins*, 116 U.S. 483, 483-85 (1886).

------------------------

[6] The Fifth Circuit stated that, in *Seila Law*, the Supreme Court "cast[] doubt on the existence of wholly . . . quasi-judicial agency powers altogether." *Jarkesy*, 34 F.4th at 464 n.19. But the Court was merely stating that a quasi-judicial agency, like other Executive Branch entities, technically uses executive power. *See Seila Law*, 140 S. Ct. at 2198 n.2 ("the powers of the FTC," which is quasi-judicial, are "'executive,' at least to some degree" (*quoting Morrison*, 487 U.S. at 690 n.28)). And that, standing alone, does not preclude the use of removal restrictions. *See supra* at 12-13.

At bottom, Plaintiff is unlikely to succeed on the merits of its claim. Under Supreme Court precedent, Congress may restrict the President's ability to remove DOJ ALJs, who perform an adjudicatory role, and *Free Enterprise*'s holding on dual for-cause restrictions does not apply here. And even if the Court finds merit in Plaintiff's legal theory, it can and should construe section 7521 in a manner that eliminates the alleged constitutional defect.

### III.   Even if Plaintiff were likely to succeed on the merits of its claim, it is not entitled to an injunction halting any ALJ proceeding against Plaintiff.

If the Court finds the challenged removal restrictions unconstitutional, it should only issue narrow relief that cures the constitutional defect by severing and invalidating the problematic removal provision insofar as it affects Plaintiff. Here, that would mean declaring that the relevant portion of section 7521—*i.e.*, the segment providing the MSPB a role in determining whether "good cause" exists for removal—is unconstitutional insofar as it affects the DOJ ALJ overseeing the administrative proceedings at issue. That ALJ would then be subject to removal at will by the Attorney General, and the administrative proceedings could proceed without the alleged constitutional defect.

"Generally speaking, when confronting a constitutional flaw in a statute, [courts] . . . sever[] [the] problematic portions while leaving the remainder intact." *Free Enter.*, 561 U.S. at 508. So long as the statute lacks an express "nonseverability clause," severance of the unconstitutional provisions is appropriate if the Court "determine[s] that the remainder of the statute is capable of functioning independently and thus would be fully operative as a law." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2350-52 (2020). "[I]t is fairly unusual for the remainder of a law not to be operative." *Id.* There is a "strong presumption of severability." *Id.* at 2350; *see also Seila Law*, 140 S. Ct. at 2210-11 ("We think it clear that Congress would prefer that [courts] use a scalpel rather than a bulldozer in curing [a] constitutional defect").

21

Here, of course, even if the Court were to sever the relevant removal provision and render DOJ ALJs removable at will by the Attorney General, the remaining provisions governing those ALJs would be "capable of functioning independently." *Barr*, 140 S. Ct. at 2350-52. Those ALJs could continue to oversee administrative proceedings even without that removal provision. Thus, the Court should at most sever that removal provision. This would be consistent with the Supreme Court's practice in recent cases involving Article II removal claims. In *Free Enterprise*, after the Supreme Court found the dual for-cause removal protections for the PCAOB to be unconstitutional, it did not disband the PCAOB or halt any of its operations. Instead, it severed "the unconstitutional tenure provisions . . . from the remainder of the statute," leaving PCAOB members "removable by the [SEC] at will." *Free Enter.*, 561 U.S. at 509. The Court reasoned that the "remaining provisions [were] not incapable of functioning independently," and that the unlawfulness of the removal restrictions had "no effect . . . on the validity of any [PCAOB] officer's continuance in office." *Id.* at 508-09.

In *Seila Law*, likewise, the Supreme Court found the removal protection for the Consumer financial Protection Bureau's ("CFPB's") Director unconstitutional. 140 S. Ct. at 2207-08. But it did not limit any of CFPB's operations. Instead, it again severed the Director's removal protection, noting that "[t]he provisions of the [statute] bearing on the CFPB's structure and duties remain fully operative without the offending tenure restriction" and that "[t]hose provisions are capable of functioning independently." *Id.* at 2209.

Against *Free Enterprise* and *Seila Law*, Plaintiff identifies no binding precedent where a court has done anything more than sever an unconstitutional removal restriction. Instead, Plaintiff notes that Congress enacted removal restrictions to protect ALJs' independence, and then speculates that if those restrictions did not exist, Congress would not have opted to use ALJs at

all. *See* PI Mot. at 18-20. This argument fails for at least two reasons. First, the Supreme Court recently clarified that, when conducting a severability analysis, courts should not try and determine whether "the statute created in [the] absence [of the severed provision] is legislation that Congress would not have enacted" because "courts are not well equipped to imaginatively reconstruct a prior Congress's hypothetical intent." *Barr*, 140 S. Ct. at 2350. Thus, unless there is an express "nonseverability clause"—and here, there is not—the Court "cannot really know what the two Houses of Congress and the President from the time of original enactment of a law would have wanted if one provision of a law were later declared unconstitutional." *Id.* The Supreme Court therefore noted that, absent a "nonseverability clause," the Court must simply apply the "strong presumption" in favor of severability, and ask whether the remainder of the statutory scheme at issue could function without allegedly unconstitutional provision. *Id.* The Court should not look into any other "indicia of congressional intent." *Id.* Here, as explained above, the remainder of the statutory scheme could function even if the removal provision at issue were severed.

Second, regardless, even though Congress sought to use removal restrictions to protect ALJ independence, that does not mean that, absent those restrictions, Congress would have *done away with ALJ proceedings altogether*. Plaintiff provides no direct evidence to support their bold assertion, much less evidence that overcomes the "strong presumption" in favor of severability. *See supra* at 21. For a similar reason, the Supreme Court rejected a nearly identical argument in *Seila Law*. There, to show that Congress would have wanted to disband the CFPB if the removal restrictions were found unconstitutional, the petitioner "highlight[ed] . . . references to the CFPB's independence in the statutory text and legislative history." *Seila Law*, 140 S. Ct. at 2210. The Court was unpersuaded, noting that although petitioner's "observations certainly confirm[ed] that Congress preferred an independent CFPB to a dependent one," they "shed little light on the critical

question whether Congress would have preferred a dependent CFPB to *no agency at all*." *Id.*
(emphasis in original). The Court further stressed that disbanding the CFPB "would trigger a major
regulatory disruption," and that it was therefore "far from evident that Congress would have
preferred no CFPB to a CFPB led by a Director removable at will by the President." *Id.*

The same reasoning applies here: although Congress may have "preferred . . . independent
[ALJs] to . . . dependent one[s]," Plaintiff offers no evidence showing that "Congress would have
preferred . . . no [ALJ proceedings] at all" over proceedings overseen by "dependent [ALJs]." *Id.*
And concluding that ALJ proceedings must cease if ALJ removal protections are found
unconstitutional "would trigger a major regulatory disruption." *Id.* As *Decker Coal* noted, that type
of ruling "would have potentially catastrophic effects on numerous past and ongoing . . .
adjudications . . . throughout the federal government." 8 F.4th at 1137. Thus, it is "far from evident
that Congress would have preferred no [ALJ proceedings] to" proceedings overseen by ALJs who
are "removable at will by the [Attorney General]." *Seila Law*, 140 S. Ct. at 2210.

Plaintiff relatedly argues that when Congress was considering the removal protections at
issue here, it also considered other legislative solutions to protect ALJ independence, thus
supposedly showing that, should those removal protections be found unconstitutional, Congress
would prefer one of those other solutions. *See* PI Mot. at 20. But this misses the point. The question
is whether, if forced to choose between having ALJs without removal protections and *not having
ALJ proceedings at all*, Congress would have preferred the latter. That would be the "only question
[the Court has] the authority to decide, and the answer seems clear." *Seila Law*, 140 S. Ct. at 2210.
If Congress prefers another solution should section 7521 be found unconstitutional, it can adopt
that solution after those removal protections are severed. *See Free Enter.*, 561 U.S. at 510 (severing

offending removal restriction, and then noting that "Congress of course remains free to pursue any [alternative] options going forward").

Accordingly, if the Court finds section 7521 unconstitutional, it should not enjoin any administrative proceeding. Instead, it should sever and invalidate the offending removal provision, with any "invalidation" being no broader than necessary to address Plaintiff's injuries stemming from section 7521. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974) (When "the relief sought produces a confrontation with one of the coordinate branches of the Government," the "framing of relief" may be "no broader than required" to address any "concrete injury"). Thus, should the Court be inclined to enter relief, it should declare the portion of section 7521 requiring an MSPB finding of "good cause" invalid insofar as it applies to the DOJ ALJ involved in the administrative proceedings at issue here.[7] That declaration would ensure that "the [relevant ALJ would be] removable at will by the [Attorney General, who is in turn] removal at will by the President," and so "the constitutional violation would disappear." *Seila Law*, 140 S. Ct. at 2209.

## CONCLUSION

For these reasons, the Court should deny Plaintiff's Motion for a Preliminary Injunction.

Dated:  July 13, 2023                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         CHRISTOPHER HALL

---

[7] This is a variation of the alternative relief Plaintiff seeks in its PI Motion. *See* PI Mot. at 21 (Plaintiff "alternatively requests that the Court declare that [DOJ] ALJs are removable at will by the Attorney General and enjoin any application of their removal protections.").

Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*
KUNTAL CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
Kuntal.Cholera@usdoj.gov

JILL E. STEINBERG
UNITED STATES ATTORNEY

*/s/ O. Woelke Leithart*
Idaho Bar No. 9257
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia 31412
Woelke.Leithart@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I am counsel for Defendants. On July 13, 2023, I effected service of the foregoing on opposing counsel by filing it through ECF.

/s/ Kuntal Cholera