# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

WALMART INC.,

               Plaintiff,

    v.

JEAN KING, IN HER OFFICIAL CAPACITY
AS CHIEF ADMINISTRATIVE LAW
JUDGE OF THE OFFICE OF THE CHIEF
ADMINISTRATIVE HEARING OFFICER,
ET AL.

               Defendants.

Case No. 6:23-cv-00040-JRH-BKE

## REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 3

ARGUMENT ................................................................................................................... 5

I.     THE EQUITABLE FACTORS WARRANT A PRELIMINARY INJUNCTION ................................. 5

       A.     Defendants Fail to Refute Walmart's Irreparable Injury ........................................ 5

       B.     Defendants Fail To Demonstrate Any Countervailing Harm To Themselves ....... 7

II.    WALMART IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM ................................. 8

       A.     Defendants Fail To Show That OCAHO ALJs Can Be Insulated From
Removal At All ...................................................................................................... 9

       B.     Defendants Fail To Show That OCAHO ALJs' Two Levels Of Stringent
Removal Protection Are Permissible ................................................................... 15

III.   THE PROPER REMEDY HERE IS TO ENJOIN THE PENDING ADJUDICATIONS BECAUSE
THE UNCONSTITUTIONAL REMOVAL RESTRICTIONS ARE NOT SEVERABLE .................... 20

       A.     Defendants Fail To Show That Congressional Intent Is Irrelevant To
Severability Analysis ........................................................................................... 21

       B.     Defendants Fail To Show That Congress Would Have Allowed OCAHO
ALJs To Be Removable At Will By The Attorney General ................................ 24

CONCLUSION .............................................................................................................. 26

CERTIFICATE OF SERVICE ...................................................................................... 26

## INTRODUCTION

Defendants repeatedly ignore Supreme Court precedent in opposing Walmart's motion for a preliminary injunction against the pending OCAHO adjudications.  On each of the key issues, Defendants hardly even try to refute Walmart's satisfaction of the applicable legal standards.  Instead, they either distort those standards beyond recognition or disregard them outright.

Defendants first erroneously analyze the requirements for equitable relief.  They contend that the ongoing adjudications do not irreparably harm Walmart because it is a large company that can bear the burdens and costs of being subjected to an unconstitutional agency adjudication.  *See* Opp. 2, 7-8.  But in *Axon Enterprises, Inc. v. FTC*, the Supreme Court explained that "having to appear in proceedings before an unconstitutionally insulated ALJ" is a "here-and-now injury" that "is impossible to remedy" later.  143 S. Ct. 890, 903 (2023) (cleaned up).  Although Defendants observe that *Axon* was not specifically addressing the issue of irreparable harm, they cannot dispute that *Axon*'s statement is the very definition of irreparable harm and equally applies to all parties subjected to unconstitutional agency adjudications, size notwithstanding.

Defendants then incorrectly assess the merits of ALJs' removal protections.  They treat *Morrison v. Olson*, 487 U.S. 654 (1988), as broadly authorizing Congress to restrict the removal of inferior executive officers who perform adjudicatory functions.  *See* Opp. 3, 10-11.  Yet they all but ignore *Seila Law LLC v. CFPB*, which explains that *Morrison* is a narrow "exception" to the general rule of at-will presidential removal that applies only to "inferior officers with limited duties and no policymaking or administrative authority."  140 S. Ct. 2183, 2199-2200 (2020).  Contrary to Defendants' baseless suggestion, that exception is inapplicable here:  Compared to the Independent Counsel in *Morrison*, ALJs possess broader jurisdiction and policymaking discretion and also enjoy stronger, dual-layered removal protections.

Defendants finally retreat to the wrong remedy for the ALJs' invalid removal protections. They assert that, absent an express nonseverability clause, courts must sever unconstitutional provisions so long as the rest of the statute can operate independently. *See* Opp. 4, 21-23. But in *Murphy v. NCAA*, the Supreme Court squarely reaffirmed the established severability principle that, even if a statute would be "fully operative" without an unconstitutional provision, courts cannot sever the provision if doing so would give the remainder "an effect altogether different" from what Congress "would … have enacted." 138 S. Ct. 1461, 1482 (2018). Defendants do not even mention *Murphy*, instead fixating on inapposite dicta in a plurality opinion that actually reaffirmed *Murphy*. Defendants go to such lengths to evade any inquiry into congressional intent because it is evident that rendering ALJs removable at will would be "exactly backwards" from Congress's perspective. *Id.* at 1483. The last thing Congress would want is a judicially ordered reversion to the repudiated regime where in-house agency adjudicators are "mere tools of the agency concerned and subservient to the agency heads." *Ramspeck v. Fed. Trial Examiners Conf.*, 345 U.S. 128, 131 (1953). Tenure protection for ALJs was just one among a set of different proposals that Congress considered to ensure adjudicative independence, *id.* at 132 n.2, which is weighty evidence that Congress would prefer for courts to halt ALJ proceedings while it enacts one of the other, constitutionally valid alternatives. That is especially clear in the context of OCAHO ALJs because Congress required the Attorney General to use them for the proceedings at issue, 8 U.S.C. § 1324a(e)(3)(B)—that choice would be nullified if the Attorney General could micro-manage their decisions on pain of removal.

In sum, Defendants' opposition is foreclosed by Supreme Court precedent at every turn. This Court should enjoin them from proceeding with the OCAHO adjudications pending against Walmart.

## ARGUMENT

### I.   THE EQUITABLE FACTORS WARRANT A PRELIMINARY INJUNCTION

In a candid effort to delay this Court's "resolv[ing] the constitutional questions," Defendants contend that Walmart is not entitled to a preliminary injunction even if it is correct on the merits.  Opp. 7.  On one hand, they assert that Walmart suffers no "'irreparable harm'" from "simply having to proceed before an ALJ protected by allegedly unconstitutional removal protections," *id.*; and on the other hand, they object that the "requested injunction would certainly interfere with federal law enforcement efforts," *id.* at 9.  Defendants err, however, on both sides of the equitable balance.  The Supreme Court's recent *Axon* decision establishes that Walmart is suffering irreparable injury from the unconstitutional ALJ proceedings; and Defendants will incur no countervailing harm from a preliminary injunction that, at worst, will merely delay their ability to recover monetary penalties for alleged past paperwork violations.

### A.   Defendants Fail to Refute Walmart's Irreparable Injury

*Axon* explained that "the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process" is "impossible to remedy" later.  143 S. Ct. at 903.  Defendants object that *Axon* "never stated that that injury would merit *emergency relief*," claiming that the case "merely held" that district courts "have jurisdiction" to hear collateral constitutional attacks against pending administrative proceedings.  Opp. 8.  But that objection disregards the necessary implication of *Axon*'s binding reasoning:   the very definition of "irreparable injury" that "support[s] preliminary relief" is injury that "cannot be undone through monetary [or other] remedies" at final judgment.  *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010).

Thus, requiring Walmart to wait for final judgment to obtain an injunction against the ongoing adjudications would impose irreparable injury for the same reason that the Supreme Court

held that requiring parties like Walmart and Axon to wait until the adjudications are over to seek judicial review "would [be] too late to be meaningful"—namely, "[a] proceeding that has already happened cannot be undone."  *Axon*, 143 S. Ct. at 904.  Defendants do not and cannot assert that this Court could award relief at final judgment that would make Walmart whole from its injury of having been dragged through an unconstitutional agency adjudication in the interim, especially given that Defendants have sovereign immunity from retrospective monetary relief.  *See* Mot. 22.

Trying to avoid the clear import of *Axon*, Defendants argue that the Supreme Court's decision in *Collins v. Yellen* "implie[s] the opposite":  they reason that because a *final action* taken by an unconstitutionally insulated official is not necessarily void under *Collins* absent evidence that the removal restriction had a harmful effect on the action, *ongoing proceedings* led by such officials do not necessarily impose irreparable harm either.  *See* Opp. 8 (citing 141 S. Ct. 1761, 1787-89 (2021)).  But that flawed reasoning replicates the very error that the Supreme Court later rejected in *Axon*.  Unlike in *Collins*, where the challenger was attacking an executed contract implemented by an unconstitutionally insulated agency head, the separation-of-powers claim in *Axon* and this case "is about subjection to an illegitimate proceeding" by an unconstitutionally insulated ALJ, "not about th[e] order" that the ALJ may issue at the end of the proceedings.  *Axon*, 143 S. Ct. at 903.  So whatever *Collins* may imply about the standard for vacating an ALJ's final decision, it does not negate the irreparable injury from the pending proceeding *itself*, which is why a party "would have the same claim" even if it ultimately "*won* before the agency."  *Id.*  In short, the standard for vacating an ALJ's final decision is immaterial to irreparable injury because Walmart "protest[s] the 'here-and-now' injury of subjection to an unconstitutionally structured

6

decisionmaking process," "irrespective of its outcome." *Id.* at 904.[1]

*Axon* likewise refutes Defendants' invocation (Opp. 7-8) of *Siegel v. LePore*, which merely declined to "go[] [so] far" as to hold that "a violation of constitutional rights always constitutes irreparable harm."  234 F.3d 1163, 1177 (11th Cir. 2000) (per curiam).  The question here is not whether *all* constitutional violations are irreparable per se, but rather whether this *particular* constitutional violation is irreparable because the Supreme Court has already held that it imposes a here-and-now injury that is impossible to remedy later.  The answer is obviously yes.  *See Scottsdale Cap. Advisors Corp. v. FINRA, Inc.*, No. 23-cv-1506, 2023 WL 3864557, at *13 (D.D.C. June 7, 2023) (holding that "the nature of … constitutional claims" challenging an adjudicatory process "suffice[s] to show irreparable harm" under the "strong language in *Axon*"), *appeal filed sub nom. Alpine Secs. Corp. v. FINRA, Inc.*, No. 23-5129 (D.C. Cir. June 8, 2023).

## B. Defendants Fail To Demonstrate Any Countervailing Harm To Themselves

On the other side of the equitable balance, Defendants grossly overstate the burdens to the federal government from the narrow preliminary injunction that Walmart seeks.  Defendants' suggestion that they would be unable to "meaningfully enforc[e]" certain provisions of immigration law, Opp. 9, ignores that Walmart asks this Court to enjoin only the specific OCAHO adjudications pending against it, not OCAHO ALJ proceedings generally (let alone any ALJ proceedings within other agencies).  *See* Mot. 24.  So OCAHO would remain free to continue adjudicating disputes against all other parties that do not raise and prevail on similar objections, while Walmart would be protected from irreparable injury during the pendency of this litigation.

---

[1] In all events, even considering the *Collins* standard, Defendants further err in asserting that Walmart does not claim that "the ALJ proceedings at issue here will unfold differently absent the ALJ removal restrictions."  Opp. 8.  Unlike in *Collins*, Walmart's remedial position is that the removal restrictions are not severable, which means that the proceedings should not unfold at all because the ALJs do not lawfully possess the power to proceed.  *Cf.* 141 S. Ct. at 1788 & n.23.

Moreover, even as to Walmart, the purported "interfere[nce] with federal law enforcement efforts" that Defendants decry (Opp. 9) is de minimis. Defendants do not dispute Walmart's showing that the pending proceedings against the company charge only recordkeeping-paperwork violations, not unlawful-employment violations; that the sole remedy for paperwork violations in the ALJ proceedings is retrospective civil penalties, not prospective cease-and-desist orders; or that the Attorney General has unquestioned authority to seek injunctive relief in federal court against any companies charged with unlawful-employment violations. *See* Mot. 23. So Defendants cannot dispute that, at worst, the preliminary injunction would merely delay the federal government's ability to recover money from Walmart until such time as they could persuade this Court or an appellate court that the ALJ adjudications may lawfully proceed. That is not a substantial harm to the federal government's law-enforcement interests, let alone serious enough to outweigh Walmart's interest in halting the here-and-now injury of being subjected to unconstitutional proceedings without any meaningful remedy later. The balance of equities thus tilts lopsidedly in Walmart's favor.

## II.   WALMART IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM

It is unsurprising that Defendants first try to get this Court to dodge the merits, because their merits defenses conflict with Supreme Court precedent. In arguing that the OCAHO ALJs' removal protections are constitutional, Defendants effectively seek to convert what *Seila Law* held to be a narrow exception to the President's unrestricted removal power into a broad rule that Congress may create independent adjudicatory officers even within Executive Branch agencies that are supposed to be accountable to the President. Under *Seila Law*, OCAHO ALJs cannot be insulated from removal at all, much less shielded from presidential supervision by two layers of stringent removal protections.

A.     **Defendants Fail To Show That OCAHO ALJs Can Be Insulated From Removal At All**

As Walmart's opening brief explained, to ensure that the President can supervise—and be held accountable for—those who assist him in carrying out his power and duty to execute federal law, the "'general rule' is that the President has 'unrestricted removal power' over executive officers." Mot. 6 (quoting *Seila Law*, 140 S. Ct. at 2198).  Although there is a narrow "exception[]" for inferior officers "with limited duties and no policymaking or administrative authority," Mot. 8 (quoting *Seila Law*, 140 S. Ct. at 2200), OCAHO ALJs do not fall within it.   In response, Defendants misread Supreme Court precedent and mischaracterize the ALJs' powers.

1.     Defendants start by trying to transform *Morrison v. Olson* from a narrow exception hanging by a thread into a broad rule with continuing vitality.  They claim that there is "no specific constitutional impediment to congressionally imposed restrictions on the President's removal powers"; that Supreme Court precedent does not "define rigid categories of those officials who may or may not be removed at will by the President"; and that courts need only "ensure that Congress does not interfere" unduly with the President's exercise of executive power (under some sort of ad hoc balancing test).  Opp. 9-10 (quoting *Morrison*, 487 U.S. at 689 & n.27).  These claims, however, reprise the precise argument made and rejected in *Seila Law*.  The court-appointed *amicus* there likewise argued that *Morrison* and *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), "establish[ed] a general rule that Congress may impose modest restrictions on the President's removal power, with only two limited exceptions" for situations where Congress "reserve[s] a role *for itself* in individual removal decisions" (as in *Myers v. United States*, 272 U.S. 52 (1926)) or "effectively" "eliminate[s] the President's removal power altogether" (as in *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)).  *Seila Law*, 140

S. Ct. at 2205 (cleaned up).  The Supreme Court emphatically repudiated that view.

*Seila Law* reaffirmed that, under text, structure, history, and precedent, "the President's removal power is the rule, not the exception." *Id*. at 2206.  It emphasized that *Morrison* and *Humphrey's Executor* are narrow "exceptions" that "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id*. at 2199-2200.  While the Supreme Court refrained from "revisit[ing] *Humphrey's Executor* or any other precedent today," it also "decline[d] to elevate [them] into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority." *Id.* at 2206.  The Court thus instructed that *Humphrey's Executor* is limited to principal officers heading "multimember agencies that do not wield substantial executive power" and *Morrison* is limited to inferior officers "with limited duties and no policymaking or administrative authority." *Id.* at 2199-2200.  *All* other executive officers remain subject to the "general rule" that the President has "unrestricted removal power." *Id.* at 2198.[2]

Despite Defendants' efforts to reframe the inquiry, therefore, the question for this Court is clear and simple:  Do OCAHO ALJs fall within either of the exceptions identified in *Seila Law*?  Defendants concede that they "are 'inferior officers' under Article II," Opp. 10, so the *Humphrey's Executor* exception for principal officers heading certain multimember agencies is inapplicable.  All that remains, then, is whether they fall within the *Morrison* exception for inferior officers.

2.    Although Defendants quote in passing *Seila Law*'s characterization of the *Morrison* exception, Opp. 10, they do not meaningfully attempt to demonstrate that OCAHO ALJs in fact

---

[2] In short, while *Morrison*'s narrow holding has not been overruled, its sweeping language that Defendants repeatedly invoke has been repudiated.  Under *Seila Law*, what Defendants say about *Myers* is actually a more accurate characterization of *Morrison*: any "expressions" in *Morrison* that go beyond "the narrow point actually decided" about the Independent Counsel are "dicta" that "do not come within the rule of stare decisis." Opp. 12.

have "limited duties and no policymaking or administrative authority," *Seila Law*, 140 S. Ct. at 2199-2200.  Defendants simply stress that OCAHO ALJs "perform only adjudicatory functions" under "three statutory provisions," and that they "do not enact rules or regulations" or "initiate investigations or bring enforcement actions."  Opp. 11.  Obviously, however, when *Seila Law* held that the *Morrison* exception applies only to inferior officers with "limited duties," it did not mean that *any* limit on their duties would suffice.  Rather, the duties must be *no broader* than the duties at issue in either *Morrison* or its doctrinal predecessor, *United States v. Perkins*, 116 U.S. 483 (1886), because those are "the outermost limits" that the Supreme Court has tolerated for inferior officers with removal protections.  *Seila Law*, 140 S. Ct. at 2199-2200.

Yet within their adjudicatory jurisdiction, OCAHO ALJs establish DOJ policy through case-by-case construction of federal immigration laws, impose civil penalties on private parties, and wield broad supervisory authority in a manner akin to a federal district judge.  *See* 28 C.F.R. Part 68; Brown PI Decl. ¶¶ 10-34.  Those powers far exceed those of the navel cadet engineer in *Perkins*, who was near the bottom of the military chain of command and responsible simply for carrying out the instructions of his superior officers.  *See* 116 U.S. at 483.  OCAHO ALJs also have broader powers in significant respects than the Independent Counsel in *Morrison*, who had "limited jurisdiction and tenure and lack[ed] policymaking" authority.  487 U.S. at 691.  The Independent Counsel's jurisdiction was restricted to investigating and prosecuting only "certain federal officials suspected of certain serious federal crimes," and only as authorized "by [a special court] pursuant to a request by the Attorney General," such that her "tenure" terminated once she accomplished the "single task" she was appointed to perform.  *Id.* at 672.  While her prosecutorial power was of course significant, it "was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter in which the Department of Justice had

a potential conflict of interest." *Seila Law*, 140 S. Ct. at 2200. "By contrast," like "the CFPB Director" in *Seila Law*, OCAHO ALJs "ha[ve] the authority to bring the coercive power of the state to bear on millions of private citizens and businesses" by imposing "penalties through administrative adjudications." *Id.* at 2200-01.

Equally important, the Independent Counsel did not have "any authority to formulate policy for the Government or the Executive Branch," because her enabling statute "specifically provide[d] that in policy matters [she was] to comply to the extent possible with the policies of the [DOJ]." *Morrison*, 487 U.S. at 671-72. Exactly the opposite for ALJs, as "the process of agency adjudication is currently structured so as to assure that [they] exercise[] [their] independent judgment" in making policy decisions about the proper implementation of the statutes within their jurisdiction. *Butz v. Economou*, 438 U.S. 478, 513 (1978). That is why DOJ's own Office of Legal Counsel recognizes that "ALJs determine, on a case-by-case basis, the policy of an executive branch agency for the administration of a federal program." Sec'y of Educ. Review of ALJ Decisions, 15 Op. O.L.C. 8, 15 (1991). Defendants assert that OLC merely "ma[de] the unremarkable point" that adjudicatory decisions "could have policy consequences." Opp. 13. But that flagrantly misrepresents OLC's opinion, which explained that, "[b]y deciding a series of cases, [an] ALJ presumably would develop interpretations of the statute and regulations and *fill statutory and regulatory interstices comprehensively with his own policy judgments*." 15 Op. O.L.C. at 14 (emphasis added). While this may appear "judicial" in "form[]," it is in substance an exercise of "executive power" to make policy where Congress has left discretion. *See United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1982 (2021); *see also Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("Filling … gaps" in "statutes within an agency's jurisdiction" requires "difficult policy choices that agencies are better equipped to make than courts."). Indeed,

while Defendants emphasize that ALJs cannot engage in general rulemaking, it is black-letter administrative law that agencies can also use a party-specific adjudication to achieve the same purposes of "formulat[ing] … agency policies" and "promulgat[ing] a new standard that w[ill] govern future conduct." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292-94 (1974).

The written decisions of OCAHO ALJs confirm the point. Published ALJ decisions "may be cited, used, or relied upon as precedents in future adjudications." DOJ, *OCAHO Decisions*, https://www.justice.gov/eoir/office-of-the-chief-administrative-hearing-officer-decisions (last visited July 26, 2023). Consider, for example, the decision in *United States v. Imacuclean Cleaning Servs., LLC*, 13 OCAHO no. 1327 (2019). The ALJ there invoked various prior ALJ "precedents," *id.* at 2 n.2, that require the government to comply with certain positions previously adopted in a guidance document, *id.* at 3; that address whether certain paperwork violations should be treated as substantive or instead technical or procedural, *id.* at 6; and that apply the statutory and non-statutory factors considered by ALJs in exercising discretion to determine civil-penalty amounts, *id.* at 4, 7-12. All this vividly illustrates the correctness of OLC's conclusion that, compared to the Independent Counsel in *Morrison*, ALJs "have a much greater opportunity … to effectively 'formulate' policy" because they adjudicate "a whole category of cases" rather than merely prosecute "a single case." 15 Op. O.L.C. at 14.[3]

**3.** Despite all this, Defendants insist that *Morrison* authorized removal restrictions for "quasi-judicial" officers. Opp. 11 (quoting 487 U.S. at 687, 690-91 & n.30). But even apart from Defendants' general overreading of that case, they have specifically misread the part they quote.

---

[3] In fact, the 20 pending proceedings against Walmart "involve issues of first impression for both OCAHO and ICE," so Chief ALJ King will be exercising policy discretion given that "no published cases interpret the regulatory requirements that ICE apparently invokes against Walmart, even at the administrative level." Brown PI Decl. ¶ 19.

*Morrison*'s discussion of "quasi-judicial" officers concerned independent adjudicatory agencies like the War Claims Commission at issue in *Wiener v. United States*, 357 U.S. 349 (1958), and the FTC as it was viewed in 1935 by *Humphrey's Executor*. Those agencies fall within *Seila Law*'s exception for principal officers who head "multimember expert agencies that do not wield substantial executive power"—*i.e.*, agencies that were deemed, "[r]ightly or wrongly," as exercising "no part of the executive power." 140 S. Ct. at 2198-2200. As Walmart explained in its opening brief, without any response from Defendants, that exception neither applies nor should be extended to *inferior* adjudicatory officers *within* executive agencies: OCAHO ALJs adjudicate disputes on behalf of the Department of Justice under the purported supervision of the President's Attorney General, yet they are insulated from removal in a manner that breaks a clear chain of command and thereby blurs the lines of accountability. *See* Mot. 15.

*Myers* itself emphasized that, because the President cannot direct quasi-judicial officers how to rule on the front end, he must be able to remove them on the back end to ensure adequate supervision over the exercise of executive power. 272 U.S. at 135. Defendants suggest that *Humphrey's Executor* rejected this view and limited *Myers* to its facts, Opp. 12, but again, *Seila Law* made clear that *Myers* is the rule and *Humphrey's Executor* is the exception, 140 S. Ct. at 2206-07. So while Congress may be able to impose removal restrictions for the principal officers of multi-member adjudicatory agencies like the MSPB, that does not mean it can impose such restrictions on inferior adjudicatory officers within executive agencies like OCAHO ALJs. Inferior executive adjudicators fall far outside the *Morrison* exception and thus must be removable at will by the President through his agency head.

**B.      Defendants Fail To Show That OCAHO ALJs' Two Levels Of Stringent Removal Protection Are Permissible**

Even if OCAHO ALJs could be subject to some level of removal restriction, Defendants cannot justify the two levels of thick insulation shielding them from presidential control.  As Walmart's opening brief explained, because these ALJs may not be removed by the Attorney General except for "good cause" as "established and determined" by the MSPB, 5 U.S.C. § 7521(a), and the MSPB members in turn may be removed by the President "only for inefficiency, neglect of duty, or malfeasance in office," *id.* § 1202(d), these "dual for-cause limitations" unconstitutionally "withdraw from the President any decision on whether … good cause exists" to remove an ALJ.  Mot. 11 (quoting *Free Enter. Fund*, 561 U.S. at 492, 495-96).  In response, Defendants attempt to rewrite both *Free Enterprise Fund* and ALJs' removal protections.

1.      Defendants principally assert that *Free Enterprise Fund* "turned on unique factors" and "went out of its way to suggest that its reasoning likely would not apply to ALJs," highlighting the decision's observation that ALJs' functions are "adjudicative" in nature.  Opp. 13, 15.  But at the time, it was "disputed" whether ALJs were even officers for purposes of Article II.  561 U.S. at 507 n.10.  And the Supreme Court simply noted that its holding "d[id] not address" ALJs one way or the other, *id.*, as part of a broader caveat that it was refraining from "general pronouncements on matters neither briefed nor argued here," *id.* at 506.

Since *Free Enterprise Fund*, the Supreme Court has squarely held that ALJs are Article II officers because they exercise "significant authority."  *Lucia v. SEC*, 138 S. Ct. 2044, 2051-52 (2018).  So Defendants are dead wrong when they assert that "ALJs do not have 'substantial executive authority.'"  Opp. 15.  And the fact that their substantial executive authority takes a "purely adjudicatory" form, *id.*, is legally immaterial under *Seila Law*, *see supra* at 11-14.

Indeed, *Seila Law* forecloses Defendants' attempt to limit *Free Enterprise Fund* to its facts. To begin, *Seila Law* described the holding of *Free Enterprise Fund* in broad terms: "we declined to extend [removal] limits to … an official insulated by *two* layers of for-cause removal protection." 140 S. Ct. at 2198. The Court did not even mention the factual aspects of *Free Enterprise Fund* that Defendants now try to portray as critical limitations, *id.*—an omission that is particularly telling given that the Court *did* carefully detail the factual aspects of *Morrison* and *Humphrey's Executor* that limit *those* holdings, *id.* at 2198-2200. Moreover, *Seila Law* agreed with the description of *Free Enterprise Fund* as a case where Congress had "effectively" "eliminate[d] the President's removal power altogether," *id.* at 2205, and that description equally applies to ALJs since the President is just as "powerless" to override the MSPB's determination of whether "good cause" exists "unless th[at] determination is so unreasonable as to constitute 'inefficiency, neglect of duty, or malfeasance in office,'" *Free Enter. Fund*, 561 U.S. at 496. Perhaps most fundamentally, while *Free Enterprise Fund* refrained from general pronouncements, *Seila Law* is full of them: it held that the President's "unrestricted removal power" is the "general rule"; that *Humphrey's Executor* and *Morrison* are narrow "exceptions" at the "outermost constitutional limits"; and that "a freestanding invitation for Congress to impose additional restrictions" is unwarranted. *See supra* at 10. Given all that, in the unlikely event that the Court were inclined to create a new exception for some executive officer protected by some removal standard, it would not be for ALJs with their stringent, dual-layered removal protections.

     **2.**     Doubtless for that reason, Defendants also assert that the Attorney General's power to remove ALJs for "'good cause'" under § 7521(a) is not "sharply circumscribed" because the term has no "statutory definition" and the MSPB purportedly "has interpreted [it] broadly." Opp. 16. In particular, Defendants claim that the MSPB has held that good cause for removal can be

16

based on "adjudicatory errors" and "failure to follow instructions."  Opp. 16.  But that exaggerates both the breadth and the relevance of the MSPB's construction of the removal standard for ALJs.

For starters, Defendants admit that, even where "good cause for discipline" exists, the MSPB can insist that purported "mitigating factors" compel "a lesser penalty than removal."  Opp. 17-18.  Yet when an inferior officer has committed concededly sanctionable conduct, it is imperative that the policy judgment whether to show leniency be made by the agency head answerable to the President.  Otherwise, there is "a diffusion of accountability" because "the public cannot" place "the blame" on anyone if they deem it "pernicious" to allow the offending officer to continue wielding governmental power.  *Free Enter. Fund*, 561 U.S. at 497-98.

In addition, Defendants significantly overstate the degree to which the MSPB will allow an ALJ to be disciplined in any way for poor adjudicatory performance.  The MSPB's "baseline for evaluating good cause in any action against an ALJ is whether the action improperly interferes with the ALJ's ability to function as an independent and impartial decision maker."  *Dep't of Labor v. Avery*, 120 M.S.P.R. 150, 153 (2013).  Because the MSPB will not allow an agency to take action against ALJs "for a reason that interferes with [their] qualified judicial independence," *id.* at 155, it is only in unusually limited circumstances that adjudicatory errors or failure to follow adjudicatory instructions can be a basis for discipline, as Defendants' own cases confirm.

For example, in *SSA v. Anyel*, the MSPB differentiated between "a high reversal or remand rate" and a "high rate of significant adjudicatory error."  58 M.S.P.R. 261, 267 (1993).  It conspicuously declined to hold that the former alone would support good cause for discipline, and it held only that the latter supported discipline (though not necessarily removal) in an extreme case where 186 of the ALJ's 211 decisions contained "substantive errors that required" reversal or vacatur because they were "inconsistent with relevant law."  *Id.* at 264, 267.  Likewise, in *Abrams*

*v. SSA*, the MSPB held that "ALJs may be disciplined for failure to follow instructions" only where those instructions are "unrelated to their decisional independence." 703 F.3d 538, 545 (Fed. Cir. 2012). The MSPB thus upheld removal in that case because the instructions violated by the ALJ were basic administrative directives about case "processing" that left "[t]he substance of the decisions … within [the ALJ's] control at all times." *Id.* Indeed, in *SSA v. Glover*, the MSPB held that an ALJ could not be disciplined *at all* for "misus[ing]" his authority in a written decision "for personal reasons which were irrelevant to the merits"—*i.e.*, criticizing a hearing assistant by name in order "to embarrass" that person. 23 M.S.P.R. 57, 77-78 (1984). The MSPB reasoned that, absent "a serious impropriety, a flagrant abuse of authority, or a serious breach of acceptable standards of judicial behavior," an ALJ may not be disciplined "for a single decisional statement" because that would infringe the ALJ's "qualified right to be free from interference in the performance of his judicial functions." *Id.* at 78.

The "good cause" removal standard in § 7521(a) is thus "rigorous" and "unusually high." *Free Enter. Fund*, 561 U.S. at 503. Given the MSPB's robust protection of ALJs' decisional independence and willingness to tolerate even conceded misconduct, it is beyond reasonable dispute that the Attorney General cannot remove OCAHO ALJs based simply on substantive disagreement with the "policy judgments" they make when "fill[ing] statutory and regulatory interstices." 15 Op. O.L.C. at 14. As in *Seila Law*, therefore, ALJs' removal protections interfere with the President's ability to resolve "disagreements about agency policy." 140 S. Ct. at 2206.

Although Defendants contend that the removal standard in *Free Enterprise Fund* was even more restrictive in some respects, Opp. 14, 17, that is the wrong baseline for comparison. Defendants do not even try to dispute Walmart's showing that the MSPB's "good cause" construction is narrower than the authorized grounds for removal in *Perkins* and *Morrison*—which

permitted removal for misconduct, including insubordinate flouting of agency policy, *see* Mot. 9—and those cases, to repeat, set "the outermost constitutional limits" on removal restrictions for inferior officers.  *Seila Law*, 140 S. Ct. at 2199-2200.

In all events, even if the "good cause" standard in § 7521(a) were as broad as the removal standards in *Perkins* and *Morrison*, the § 7521(a) standard still would be constitutionally worse because it is applied in the first instance by the MSPB.  The MSPB is "not responsible for the [ALJs'] actions," and the President cannot even hold that independent agency "responsible for [its] own determination" that the ALJ removal standard is not satisfied.  *Free Enter. Fund*, 561 U.S. at 496.  This "multilevel protection from removal is contrary to Article II's vesting of the executive power in the President" because, "[w]ithout the ability to oversee [ALJs], or to attribute the [ALJs'] failings to those whom he *can* oversee, the President is no longer the judge of [their] conduct."  *Id.* at 484, 496.  Defendants suggest that this is no different from the fact that independent "Article III courts" would "review[] an executive officer's removal" under *Perkins* and *Morrison*, Opp. 20, but there is a critical distinction when review of removals is vested in an independent agency like the MSPB located *within* the Executive Branch.  Unlike when the separate Judicial Branch blocks the removal of an inferior executive officer, when one arm of the Executive Branch blocks another arm from removing an inferior officer, "such machinations blur the lines of accountability," *Arthrex*, 141 S. Ct. at 1982, and confuse the public's ability to "determine on whom the blame … ought really to fall" that the officer remains in office, *Free Enter. Fund*, 561 U.S. at 498.

**3.**      Defendants fall back to the position that this Court can save § 7521(a) from "constitutional defect" by "construing" it to limit the MSPB's role—*i.e.*, to relegate the MSPB to making a "factual finding[]" "whether the evidence supports" the agency head's "discretionary judgment" about the meaning and application of "good cause for removing an ALJ."  Opp. 20.

But that "construction" of the statute is neither textually defensible nor constitutionally viable.

*Seila Law* squarely held that "[c]onstitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say in a given situation."  140 S. Ct. at 2207.  And here, the statute unambiguously vests the discretionary judgment of what constitutes "good cause" to remove an ALJ in the MSPB, not the agency head:  Removal is permitted "only for good cause *established and determined by* the [MSPB]."  5 U.S.C. § 7521(a) (emphasis added).  Especially given that the statute provides that the MSPB not only "determines" but also "establishes" "good cause," it cannot "plausibly be read" to limit the MSPB to a mere factfinding role, and "[t]he constitutional-avoidance canon does not countenance such textual alchemy."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 843, 846 (2018).  In fact, just as in *Seila Law*, Defendants "do not attempt to root" their interpretation "in the statutory text."  140 S. Ct at 2206.

Regardless, even the cabined role for the MSPB that Defendants propose would exceed what Article II allows.  As discussed, *any* "good cause" protection for ALJs violates the President's unrestricted removal power in light of their policymaking authority and broad jurisdiction and tenure, *see supra* at Part II.A; and at minimum, *any* MSPB involvement constitutes a prohibited second level of cause protection, *see supra* at 16, 19.

## III.   THE PROPER REMEDY HERE IS TO ENJOIN THE PENDING ADJUDICATIONS BECAUSE THE UNCONSTITUTIONAL REMOVAL RESTRICTIONS ARE NOT SEVERABLE

Finally, Defendants fare no better in arguing that, even if OCAHO ALJs' removal protections are unconstitutional, the most that this Court should do is sever and invalidate their removal protections, which would make them removable at will by the Attorney General.  Opp. 21.  Although the constitutional defect requires at the very least that remedy, *see id.* at 25 & n.7, it is not the proper remedy in the context of this statutory scheme.

As Walmart's opening brief explained, because the touchstone of severability analysis is whether the remainder of the statute "will function in a *manner* consistent with the intent of Congress," courts cannot sever unconstitutional provisions if that would give the remaining statute "an effect altogether different from that sought by the measure when viewed as a whole."  Mot. 17 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987), and *Murphy*, 138 S. Ct. at 1482).  And here, because the central purpose of the statutory scheme was to redress complaints that the ALJs' predecessors "were mere tools of the agency concerned and subservient to the agency heads," remedying the constitutional defect by making OCAHO ALJs removable at will "would have seemed exactly backwards" to Congress.  Mot. 18, 21 (quoting *Ramspeck*, 345 U.S. at 131, and *Murphy*, 138 S. Ct. at 1483).  In response, Defendants take the astonishing position that congressional intent is irrelevant, as they have no plausible account that Congress would want agency adjudicators, much less OCAHO ALJs, to be removable at will by the agency head.

## A. Defendants Fail To Show That Congressional Intent Is Irrelevant To Severability Analysis

Defendants contend that, where a statute lacks an "express 'nonseverability clause,'" courts must sever the unconstitutional provisions so long as "the remainder of the statute is capable of functioning independently and thus would be fully operative as a law."  Opp. 21.  They insist that this "strong presumption" favoring severance precludes courts from considering any other "indicia of congressional intent."  Opp. 23.  Thus, because it would be technically possible for OCAHO's ALJs to "continue to oversee administrative proceedings" even if they were "removable at will by the Attorney General," Defendants argue that this Court must select that remedy.  Opp. 22.

None of that, however, is the law.  The Supreme Court has long held that, even where the rest of the statute is capable of "independent operation," "[t]he more relevant inquiry … is whether

the statute will function in a *manner* consistent with the intent of Congress." *Alaska Airlines*, 480 U.S. at 685. Accordingly, the "well established" severability standard instructs that "the invalid part may be dropped if what is left is fully operative as a law" "*[u]nless it is evident that the Legislature would not have enacted those provisions* which are within its power, independently of that which is not." *Id.* at 684 (emphasis added).

The Supreme Court recently applied this settled approach in *Murphy v. NCAA*. There, having held that a federal statute unconstitutionally prohibited States from "authoriz[ing]" or "licensing" private sports-gambling facilities, the Court had to decide the impact on the law's separate prohibition on States themselves "operat[ing]" gambling facilities. 138 S. Ct. at 1482. Invoking the *Alaska Airlines* standard, the Court framed the inquiry as whether, "[i]f Congress had known that States would be free to authorize sports gambling in privately owned casinos, would it have nevertheless wanted to prevent States from running sports lotteries?" *Id.* "That seem[ed] most unlikely"—at the time, "[s]tate-run lotteries … were thought more benign than other forms of gambling," while "[c]asino gambling … was generally regarded as far more dangerous"—and so "legalizing sports gambling in privately owned casinos while prohibiting state-run sports lotteries would have seemed exactly backwards" "[t]o the Congress that adopted" the legislation. *Id.* at 1482-83. Because severance would have created "a scheme sharply different from what Congress contemplated," the Court held that the operation ban was inseverable from the authorization and licensing bans. *Id.* at 1482. And the Court likewise deemed another prohibition in the statute inseverable because retaining it would "implement[] a perverse policy" and cause "a weird result" that Congress never "contemplated." *Id.* at 1483-84. In short, even absent an express nonseverability clause or any functional inoperability, the Court held that the remainder of the statute could not be preserved because Congress clearly would not have wanted the rump scheme.

Remarkably, although Walmart's opening brief relied on *Murphy* and *Alaska Airlines*, Defendants' opposition brief never even mentions those cases, much less distinguishes them. More remarkably, Defendants instead insinuate that these precedents were implicitly abrogated by a recent decision that they mischaracterize in multiple respects.

Defendants cherry-pick certain statements from *Barr v. American Ass'n of Political Consultants*, 140 S. Ct. 2335 (2020), to support their assertion that "the Supreme Court recently clarified that … courts should not try and determine" whether "Congress would not have enacted" the rest of the law standing alone, due to the difficulties in ascertaining uncodified legislative intent. Opp. 23. Defendants inaccurately portray the cited discussion as part of a majority opinion for the Court, Opp. 21, 23, but that section obtained only three votes, *Barr*, 140 S. Ct. at 2342, 2349-52. Worse still, the plurality's statements about ascertaining congressional intent were dicta, as the statute there had an express severability clause. *Id.* at 2352-53. And worst of all, the plurality was not even purporting to abrogate the settled severability standard, as it affirmatively cited *Murphy* when reaffirming that courts must ensure that the rest of the statute would constitute a "fully operative" enactment. *Id.* at 2352 (citing *Murphy*, 138 S. Ct. at 1481-84). Thus, the *Barr* plurality at most reframed *Murphy*'s congressional-intent inquiry to be part of what it means for the remaining statute to be "capable of functioning independently." *Id.* Indeed, the notion that Justice Kavanaugh's plurality opinion in *Barr* was trying to implicitly abrogate *Murphy* is preposterous given that the only two Justices who joined this section of the opinion were Justice Alito (who authored the majority opinion in *Murphy*) and Chief Justice Roberts (who joined it). *Compare Barr*, 140 S. Ct. at 2342, *with Murphy*, 138 S. Ct. at 1468.

**B.      Defendants Fail To Show That Congress Would Have Allowed OCAHO ALJs To Be Removable At Will By The Attorney General**

It is obvious why Defendants advance the untenable argument that this Court must ignore legislative intent:   Congress clearly would never have allowed OCAHO ALJs to conduct adjudications while removable at will by the Attorney General.   Defendants do not dispute that the primary purpose underlying Congress's creation of the ALJ regime was *to eliminate* agency heads' control over in-house adjudicators because independence was perceived as necessary for a fair hearing.   Opp. 23; *see* Mot. 18-19.   Nor do they dispute that, to effectuate that objective, Congress had before it *several alternative proposals* besides removal protection, such as creating an independent adjudicatory agency.   Opp. 24; *see* Mot. 20.   Defendants thus cannot dispute that judicially rendering ALJs removable at will—*i.e.*, reverting to the flawed system that Congress was trying to replace—would have been Congress's last remedial choice, not its first.

Although Defendants repeatedly emphasize that the Supreme Court severed removal restrictions in *Seila Law* and *Free Enterprise Fund*, Opp. 22-24, the critical distinction is that there was no evidence in those cases that Congress had affirmatively considered alternative options that would have achieved its goals better.   *See Seila Law*, 140 S. Ct. at 2210; *Free Enter. Fund*, 561 U.S. at 509.   The Court recognized that other options might exist, but those were merely "theor[etical]" possibilities, not real-world reasons to conclude that Congress would have opposed severance.   *Free Enter. Fund*, 561 U.S. at 509-10; *accord Seila Law*, 140 S. Ct. at 2211.   And while this Court cannot judicially create the alternatives to independent ALJs that Congress previously considered, *see* Opp. 24; *Seila Law*, 140 S. Ct. at 2211 (citing *Free Enter. Fund*, 561 U.S. at 510), Congress's consideration of those alternatives is weighty evidence that, compared to "dependent [ALJs]," Congress in fact "would have preferred … *no [ALJs] at all*" until it can fix

the scheme itself, *Seila Law*, 140 S. Ct. at 2210.  In other words, rather than having the judiciary recreate in-house adjudicators who are "mere tools of the agency concerned," *Ramspeck*, 345 U.S. at 131—"exactly backwards" from what Congress was trying to achieve, *Murphy*, 138 S. Ct. at 1483—it is evident that Congress would want courts to halt in-house adjudications while it establishes a new scheme to ensure that adjudicators can constitutionally exercise the "independent judgment" that it deems necessary for a "fair and competent hearing," *Butz*, 438 U.S. at 513-14.

Importantly, all this applies with particular force to *OCAHO* ALJs.  As Walmart explained and Defendants completely ignore, the statute at issue here—in stark contrast to the default rule under the APA—requires the Attorney General to conduct all hearings using the removal-protected ALJs, thus ensuring decisional independence.  *Compare* 8 U.S.C. § 1324a(e)(3)(B), *with* 5 U.S.C. § 556(b).  Making the ALJs wholly subservient to the Attorney General would effectively nullify that statutory provision, which is clear textual evidence that Congress would not have wanted OCAHO's ALJs to be rendered removable at will.   In fact, that provision is the functional equivalent of the "express 'nonseverability clause'" that Defendants deem so vital.  Opp. 23.  Furthermore, there would be minimal "disruption" from halting these OCAHO proceedings while Congress enacts a constitutionally valid scheme, Opp. 24, because the proceedings are limited to imposition of backward-looking civil penalties for alleged paperwork violations, while the Attorney General retains unquestioned authority to seek prospective injunctive relief in federal court for unlawful-employment violations, *see supra* at 8.  Accordingly, regardless of how courts may resolve the remedial analysis for other ALJs, OCAHO ALJs' removal protections are nonseverable.

## CONCLUSION

This Court should enjoin Defendants from proceeding with the OCAHO adjudications pending against Walmart.

July 27, 2023                                    Respectfully submitted,

                                                 /s/ Hashim M. Mooppan
                                                 Hashim M. Mooppan (pro hac vice)
                                                 T. Elliot Gaiser (pro hac vice)
                                                 JONES DAY
                                                 51 Louisiana Ave., N.W.
                                                 Washington, D.C.  20001
                                                 (202) 879-3939
                                                 hmmooppan@jonesday.com

                                                 Joseph E. Finley
                                                 Attorney Bar Number: 261526
                                                 JONES DAY
                                                 1221 Peachtree St., N.E., Suite 400
                                                 Atlanta, GA  30361
                                                 (404) 521-3939
                                                 jfinley@jonesday.com

                                                 *Attorneys for Plaintiff Walmart Inc.*

## CERTIFICATE OF SERVICE

On July 27, 2023, I caused the foregoing to be filed and served using ECF.

                                                 /s/ Hashim M. Mooppan
                                                 Hashim M. Mooppan (pro hac vice)
                                                 *Attorney for Plaintiff Walmart Inc.*