UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| Walmart Inc.,<br><br>*Plaintiff*,<br><br>v.<br><br>Jean King, in her official capacity as Chief Administrative Law Judge of the Office of the Chief Administrative Hearing Officer, *et. al.*,<br><br>*Defendants*. | Civil Action No. 23-cv-00040-JRH-BKE |

### DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff's legal theory is novel and extreme. Although Plaintiff tries to assure the Court otherwise, its theory, if accepted, could derail the proceedings overseen by the nation's roughly 2,000 administrative law judges ("ALJs"). Fortunately, the Supreme Court's precedents neither require nor permit this result. Indeed, the Court has expressly suggested that statutory removal protections for ALJs pose no separation-of-powers concern under its precedents. Perhaps recognizing this, Plaintiff's Reply relies heavily on inflammatory rhetoric and purported limits on removal restrictions that the Supreme Court never imposed. This Court should deny Plaintiff's motion for an extraordinary preliminary injunction that interferes with federal government operations.

Most of Plaintiff's arguments are already addressed in Defendants' Response. Defendants thus will here address the points that Plaintiff emphasizes in its Reply.

*Balance of the Equities.* Plaintiff asks this Court to interfere with the law enforcement efforts of a coequal branch of government, all to spare Plaintiff—a large multinational

1

corporation—from having to undergo administrative proceedings that may result in the imposition of certain fines. In support, Plaintiff's Reply focuses on two principal arguments, neither of which justifies the extraordinary relief it seeks.

First, Plaintiff argues that in *Axon Enterprise, Inc. v. Federal Trade Commission*, 143 S. Ct. 890 (2023), the Supreme Court stated that having to proceed before an ALJ protected by allegedly unconstitutional removal restrictions represents an injury that cannot be undone later, and is therefore an "irreparable" injury. *See* Reply at 5-6. But an alleged injury does not warrant emergency interim relief simply because it cannot be undone after judgment. For example, the Supreme Court has stated that "litigation expense" may be "substantial and *unrecoupable*," but nonetheless "does not constitute irreparable injury" warranting a preliminary injunction. *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) (emphasis added). Plaintiff offers no authority indicating that its alleged constitutional injury is sufficient for emergency relief, and several courts have concluded that it is not.[1] Indeed, issuing a preliminary injunction in a circumstance like this would contravene the principle that emergency relief is an "extraordinary and drastic remedy," *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016), not the standard remedy for an alleged constitutional violation, *see Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) ("a violation of constitutional rights" does not "always constitute[] irreparable harm" warranting a preliminary injunction).

---

[1] *See John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1135 (D.C. Cir. 2017) ("In the absence of "immediate or ongoing harm stemming from the [Bureau's] alleged constitutional defects," the "violation of separation of powers" by itself is not invariably an irreparable injury."); *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir.) (rejecting the argument that "generalized separation of powers, by itself, constituted irreparable harm," and noting that "a violation of a constitutional right alone constitutes irreparable harm" only in "cases involving individual rights, not the allocation of powers among the branches of government."), *reh'g en banc granted, judgment vacated*, 973 F.3d 1151 (10th Cir. 2020), *and opinion reinstated sub nom. Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021).

Second, Plaintiff argues that its requested relief will not harm Defendants because it would be limited to Plaintiff's own proceedings before an ALJ assigned to the Department of Justice's Office of the Chief Administrative Hearing Officer (a "DOJ ALJ"). *See* Reply at 7. But regardless of the scope of the requested injunction, it would have the Court interfere with ongoing law enforcement actions by the Department of Homeland Security ("DHS") concerning alleged violations of the Immigration and Nationality Act ("INA"). That, in itself, impedes the functions of, and thus harms, the federal government.

Accordingly, the balance of the equities counsels against Plaintiff's requested relief.

*Likelihood of Success on the Merits.*  Plaintiff argues that the ALJ removal restrictions are unconstitutional, ignoring clear precedent the Supreme Court has never repudiated and proposing new limits on removal authority the Supreme Court has never endorsed.

Plaintiff first makes the extraordinary assertion that Congress may impose *no* limits on the President's ability to remove ALJs. But the Supreme Court has made clear that removal limits for adjudicatory officers are permissible. *See* Defs.' Resp. at 10-11. As recently as 2020, the Court emphasized that Congress may restrict the President's ability to remove inferior officers who have "limited duties and no policymaking or administrative authority." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2200 (2020) (*citing Morrison v. Olson*, 487 U.S. 654, 691 (1988)). Consistent with binding precedent, this standard would include quasi-judicial officers; they, by definition, perform adjudicatory rather than "policymaking or administrative" functions. *See* Defs.' Resp. at 11. DOJ ALJs are undeniably quasi-judicial officers. *Cf. Free Enter.*, 561 U.S. at 507 n.10 ("many [ALJs] . . . perform adjudicative rather than enforcement or policymaking functions."); *Ramspeck v. Fed. Trial Examiners Conf.*, 345 U.S. 128, 130 (1953) ("hearing examiners"—the precursors to modern ALJs—were "quasi-judicial officers"). They only resolve

3

disputes as neutral arbiters. *See* Defs.' Resp. at 6. Plaintiff does not dispute that those ALJs do not enact regulations, or initiate investigations or enforcement actions. *See id.* at 6. Congress can thus restrict the removal of DOJ ALJs.

Plaintiffs' arguments in response to that uncontroversial proposition only underscore the weakness of its claim. First, Plaintiff suggests new limits on the *Morrison* standard that the Supreme Court never adopted. For example, Plaintiff calls this standard "narrow"—language the Court itself never used—and states that it applies only to inferior officers whose duties are "*no broader* than" those assigned to the independent counsel in *Morrison* or to the Navy cadet in *United States v. Perkins*, 116 U.S. 483 (1886). Reply at 9-11 (emphasis in original). But the Court never said that. To the contrary, it framed the standard in broad terms (referring generally to inferior officers with "limited duties and no policymaking or administrative authority").[2]

Plaintiff also argues that the Supreme Court sanctioned the use of removal restrictions for adjudicatory officers, but only if they are *principal* officers. *See* Reply at 14. The Supreme Court never made that distinction. To the contrary, the Court suggested, using language from the *Morrison* standard, that removal restrictions for ALJs—which Plaintiff asserts hold inferior offices—are acceptable because "many [ALJs] . . . perform adjudicative rather than enforcement or policymaking functions." *Free Enter.*, 561 U.S. at 507 n.10. Tellingly, Plaintiff offers no sensible reason why the Court would permit removal restrictions for adjudicatory principal officers, but not adjudicatory inferior officers.

---

[2] Plaintiff relies on the statement in *Seila Law* that the *Morrison* standard "represent[s] what up to now ha[s] been the outermost constitutional limits of permissible congressional restrictions on the President's removal power" over inferior officers. 140 S. Ct. at 2200. But that does not mean that removal restrictions for an independent counsel or Navy cadet represent the "outermost . . . limits" of the *Morrison* standard. Stated differently, the Court merely noted that the *Morrison* standard represents a limit on removal authority; not that the *Morrison* standard is itself limited.

Plaintiff then rehashes its argument that ALJs have policymaking authority, relying on an Office of Legal Counsel ("OLC") memorandum concerning Department of Education ALJs. *See* Reply at 12 (citing 15 Op. O.L.C. 8, 15 (1991) (the "OLC Memo")). But as Defendants already noted, the OLC Memo makes the unremarkable point that certain adjudicatory functions—like interpreting a vague statute—can have broader policy consequences. *See* Defs.' Resp. at 13. That does not convert ALJs into policymakers. Plaintiff protests that this argument "flagrantly misrepresents" the OLC Memo, but the memo itself acknowledges that "[t]he functions of ALJs . . . can also be understood as 'quasi-judicial' in nature." *See* OLC Memo at 15 n.14. Plaintiff relies on a separate part of the OLC Memo which states that ALJs often "develop interpretations of . . . statute[s] and regulations and," in the process, "fill statutory and regulatory interstices" using their judgment, which can impact federal policy. Reply at 12 (*quoting* OLC Memo). But this is another way of saying that in interpreting preexisting laws or regulations—an adjudicatory function—ALJs can affect federal policy. It does not mean that ALJs perform actual policymaking functions, like enacting *new* laws or regulations. Indeed, federal judges can also impact national policy when choosing among competing interpretations of various statutes, but that does not render them policymakers either. In any event, regardless of what the OLC Memo says, Defendants' position here is that the DOJ ALJs are not policymakers.[3]

Plaintiff finally asserts that ALJs can "impos[e] penalties" on "millions of private citizens and businesses." Reply at 12. That is an overstatement. ALJs do not unilaterally impose any penalties untethered from an adjudication; rather, they decide on appropriate penalties only once

---

[3] Regardless of whether ALJs are colloquially said to "formulate policy" in light of the policy consequences of their decisions, that does not mean ALJs possess "policymaking authority" for purposes of the *Morrison* standard. The Supreme Court suggested this much when it stated that ALJ removal restrictions are likely acceptable because ALJs perform adjudicative, rather than policymaking, functions. *See supra* at 5.

5

another entity—such as DHS—has sought to impose a penalty in the first instance and has established charges warranting a penalty. *See* Defs.' Resp. at 5-6. And even then, the Attorney General can modify DOJ ALJ final decisions. *See id.* at 6. Accordingly, DOJ ALJs perform adjudicatory functions, and so Congress may place limits on their removal.

Plaintiff then turns to its next theory, arguing that even if certain limits on ALJ removal are acceptable, dual-layer removal limits are not in light of *Free Enterprise*. Plaintiff, however, does not seriously dispute that the circumstances in that case were far different from those here. For example, Plaintiff does not dispute that the powers of DOJ ALJs do not rival those held by the entity at issue in *Free Enterprise*, the Public Company Accounting Oversight Board ("PCAOB"). The PCAOB can issue regulations governing an entire industry, initiate investigations, and bring enforcement actions under several statutes. *See* Defs.' Resp at 14. DOJ ALJs can do none of that. *See id.* at 5-6. Nor does Plaintiff dispute that the "good cause" standard applicable to ALJ removals is not as stringent as the removal standard applicable to PCAOB members. PCAOB members could be removed only in three narrow circumstances. *See id.* at 14-15. DOJ ALJs are subject to a generic "good cause" standard. *See id.* at 16-17.

Critically, in *Free Enterprise*, the Supreme Court found these distinctions between the PCAOB and ALJs to be meaningful. In response to the dissent's concern that the Court's holding could apply to ALJs, the Court noted that "unlike members of the [PCAOB], many [ALJs] of course perform adjudicative rather than enforcement or policymaking functions." 561 U.S. 477, 507 n.10 (2010). The Court also implied that the removal protections for ALJs were materially distinct from those for PCAOB members. *See id.* at 506 ("the employees referenced by the dissent" do not "enjoy the same significant and unusual protections . . . as members of the [PCAOB]"); *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2061 (2018) (Breyer, J. concurring in part) (the "*Free Enterprise*

*Fund* Court" stated that "[ALJs] were distinguishable from the [PCAOB] members" because many "perform adjudicative . . . functions" and they do not "enjoy the same significant and unusual protections"). Further, when *Free Enterprise* was before the D.C. Circuit, then-Judge Kavanaugh also implied that ALJ removal protections were permissible. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J. dissenting) ("ALJs perform only adjudicatory functions that are subject to review by agency officials, and that arguably would not be considered 'central to the functioning of the Executive Branch' for purposes of the Article II removal precedents."), *aff'd in part, rev'd in part and remanded*, 561 U.S. 477 (2010). The *Free Enterprise* holding that struck down the PCAOB dual-layer "for cause" removal restrictions therefore does not apply to ALJs.

Notably, the Ninth Circuit recently rejected a nearly identical challenge to ALJ removal restrictions in *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1129-36 (9th Cir. 2021). And although the Fifth Circuit found ALJ removal restrictions unlawful in *Jarkesy v. S.E.C.*, 34 F.4th 446, 463-65 (5th Cir. 2022), Judge Davis's panel dissent and Judge Haynes's en banc denial dissent explained why the Fifth Circuit was wrong, and the Supreme Court has since agreed to review *Jarkesy*, *see* Defs.' Resp. at 19-20 & n.5. Plaintiff's Reply addresses neither *Decker Coal* nor *Jarkesy*.

Plaintiff argues that *Free Enterprise*'s language concerning ALJs is no longer relevant since, at the time, it was unclear whether ALJs were "officers" under Article II. *See* Reply at 15. But Plaintiff conflates two separate issues. When suggesting that its *Free Enterprise* holding would not apply to ALJs, one rationale the Supreme Court offered was that "[w]hether [ALJs] are necessarily 'Officers of the United States' is disputed." 561 U.S. at 507 n.10. As Plaintiff argues, and Defendants do not dispute here, the Supreme Court later resolved that issue in *Lucia v. S.E.C.*,

138 S. Ct. 2044 (2018).[4] *See* PI Mot. at 10. But the Supreme Court offered a *separate* rationale for why the *Free Enterprise* holding likely would not apply to ALJs: they "perform adjudicative rather than enforcement or policymaking functions." *Id.* That rationale still applies today. Plaintiff also notes that the Supreme Court did not reach a definitive conclusion on the permissibility of ALJ removal restrictions. *See* Reply at 15. True, but the Supreme Court still suggested that ALJ removal restrictions are permissible, and that suggestion is telling; after all, the Supreme Court could have said nothing at all on the subject. Further, in *Lucia*, the Supreme Court declined to even hear the argument that ALJ removal restrictions are unconstitutional. 138 S. Ct. at 2051 n.1 ("the Government asked us to" consider "whether the statutory restrictions on removing the Commission's ALJs are constitutional . . . we chose not to take that step").

Plaintiff then argues that the Supreme Court has intimated that dual-layer "for cause" removal restrictions are never permissible. *See* Reply at 16. In support, Plaintiff asserts that "*Seila Law* described the holding of *Free Enterprise Fund* in broad terms: 'we declined to extend [removal] limits to . . . an official insulated by two layers of for-cause removal protection.'" *Id.* (*quoting Seila Law*, 140 S. Ct. at 2198). But the Supreme Court did not radically expand its *Free Enterprise* holding in a single passing sentence. It was simply providing a succinct summary of what occurred in *Free Enterprise*: the Court "declined to" permit the two layers of removal protections for certain "official[s]" (PCAOB members).

---

[4] Plaintiff also notes that, in *Lucia*, the Supreme Court concluded that ALJs wield "significant authority." Reply at 15. But the Court merely found that the ALJs at issue there exercised the type of "significant authority" necessary to render them "officers" under Article II. *See Lucia*, 138 S. Ct. at 2052. It did not hold that those ALJs, or any other ALJs, wielded the type of "substantial executive authority" that could jeopardize their removal protections under *Free Enterprise*. Indeed, had the Court intended to reach the latter conclusion, it presumably would have taken up the request to review ALJ removal restrictions—but it expressly refused to do so. *See id.* at 2051 n.1.

Plaintiff then asserts that the removal standard for ALJs is unduly strict, pointing to cases showing that the Merit System Protection Board ("MSPB") will not necessarily find "good cause" to remove an ALJ whenever she or he makes an "adjudicatory error[]" or engages in some form of misconduct, and that the MSPB will consider "mitigating factors." Reply at 17-18. But Plaintiff never shows that this is different from how a typical "good cause" removal standard works. Nor does Plaintiff dispute that, in appropriate circumstances, adjudicatory errors and misconduct can justify removal of an ALJ. Plaintiff's argument simply demonstrates what Defendants never denied: in practice, the "good cause" standard has some effect; it does not devolve into "at-will" removal where the MSPB rubber-stamps any agency head's request to remove an ALJ. But this does not make the "good cause" removal standard applicable to ALJs comparable to the "sharply circumscribed," "rigorous," and "unusual[]" removal standard that protected PCAOB members. *Free Enter.*, 561 U.S. at 502-05; *see also* Defs.' Resp. at 16-18.

Accordingly, Plaintiff fails to show that the long-standing ALJ removal restrictions are unconstitutional. And if there is any uncertainty, the Court must err in favor of finding those restrictions permissible. *See United States v. Davila-Mendoza*, 972 F.3d 1264, 1269 (11th Cir. 2020) (courts must "generally presume statutes to be constitutional").

*Severability.* If the Court finds the ALJ removal limits to be impermissible, it should not enjoin any ALJ proceeding. Instead, it should sever those removal limits, and declare them invalid, insofar as they protect the DOJ ALJ overseeing the administrative proceedings at issue. *See* Defs.' Resp. at 21-25. When a Court finds a statutory provision unconstitutional, it must presumably "sever[] [the] problematic [provision] while leaving the remainder" of the statutory scheme "intact." *Free Enter.*, 561 U.S. at 508; *see also Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984) ("the presumption is in favor of severability."). A statutory "provision is . . . presumed severable if what

9

remains after severance is fully operative as a law;" if the remaining scheme constitutes "workable administrative machinery." *I.N.S. v. Chadha*, 462 U.S. 919, 934 (1983). Importantly, in recent cases involving Article II challenges to removal limits, the Supreme Court has simply severed the offending removal limits. *See* Defs.' Resp. at 22. Plaintiff does not refer to a single case in which a Court has found an impermissible removal limit non-severable.

Here, under the applicable standard, the ALJ removal limits are severable. Even if ALJs are no longer shielded from removal, they can still oversee administrative proceedings. ALJ proceedings would still constitute "workable administrative machinery." *Chadha*, 462 U.S. at 934. In its Reply, Plaintiff again argues that Congress implemented the ALJ removal limits to protect ALJ independence, and that this somehow means that, if those removal limits were found unconstitutional, Congress would have wanted to *dispose of ALJ proceedings altogether*. *See* Reply at 24-25. Plaintiff's assertion is implausible. True, Congress may have wanted ALJ removal limits to promote ALJ independence, but that does not mean Congress would have ever wanted to jettison ALJ proceedings altogether. Plaintiff still cannot cite to any concrete evidence indicating that Congress ever intended for that extreme result.

Furthermore, Plaintiff does not dispute that the Supreme Court's decision in *Seila Law* rejected an argument nearly identical to the one Plaintiff makes here. There, the petitioner challenged the Consumer Financial Bureau ("CFPB") Director's statutory removal restrictions and argued that, if they were found unlawful, Congress would have wanted to disband the CFPB altogether. *See Seila Law*, 140 S. Ct. at 2210. In support, the petitioner "highlight[ed] . . . references to the CFPB's independence in the statutory text and legislative history." *Seila Law*, 140 S. Ct. at 2210. The Court rejected this argument: although petitioner's "observations certainly confirm[ed] that Congress preferred an independent CFPB to a dependent one," it noted, they "shed little light

on the critical question whether Congress would have preferred a dependent CFPB to *no agency at all*." *Id.* (emphasis in original). The Court also noted that disbanding the CFPB "would trigger a major regulatory disruption," and that it was therefore "far from evident that Congress would have preferred" to have "no CFPB" at all. *Id.* The same reasoning applies here: even if Congress "preferred . . . independent [ALJs] to . . . dependent one[s]," that does not mean it "would have preferred . . . no [ALJ proceedings] at all" over proceedings overseen by "dependent [ALJs]." *Id.* And terminating ALJ proceedings in general would be disruptive since it "would have potentially catastrophic effects on numerous past and ongoing . . . adjudications . . . throughout the federal government." *Decker Coal*, 8 F.4th at 1137.

Plaintiff also reiterates its argument that, aside from removal restrictions, Congress considered other measures for buttressing ALJ independence. *See* Reply at 24. But again, the question is not whether Congress preferred those alternative measures over having ALJs with less independence. The question is whether Congress preferred *no ALJ proceedings at all* over having ALJs with less independence. That would be the "only question [the Court has] the authority to decide, and the answer seems clear." *Seila Law*, 140 S. Ct. at 2210.

Plaintiff then faults Defendants for not addressing *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018). But that case—which concerned an anti-commandeering challenge to a sports gambling statute, *see id.* at 1471-72—has no relevance here. In *Murphy*, the statute at issue prohibited States from "'operat[ing],' 'sponsor[ing],' . . . 'promot[ing],'" or "authorizing" sports gambling schemes. 138 S. Ct. at 1482. The Court found the prohibition on a State's ability to "authorize" sports gambling schemes unconstitutional, and concluded that the remainder of the prohibition—including the bar on a State "operating" its own gambling schemes—must fall since, otherwise, the outcome would have been incoherent. *See id*. It would

11

be entirely "unusual" to allow a State to *authorize* gambling schemes but not allow the State to *operate* its *own* gambling schemes. *See id.* at 1483. That issue does not apply here. There is nothing incoherent or unusual about allowing ALJ proceedings to continue even if the ALJs are removable at will. They can still hold proceedings involving claims brought under a variety of federal statutes.

The Supreme Court also found that a separate statutory provision—one prohibiting private parties from operating sports gambling schemes "pursuant to state law"—could not be severed either. *Id.* But that private party provision was not severable because it was inextricably linked to the one the Supreme Court had found unconstitutional. The private party provision barred private parties from operating certain gambling schemes "pursuant to state law" because, under the federal statute at issue, States were not allowed to pass laws authorizing those schemes. *See id.* (the two provisions "were obviously meant to work together."). But once the Court struck down the provision prohibiting State authorization of gambling schemes, the bar on private party gambling schemes authorized by State law had to fall as well. *See id.* Otherwise, a private gambling scheme could be unlawful under federal law even though a State had lawfully authorized it. The two provisions thus had to stand or fall together. The same is not true here: the provisions governing ALJ proceedings and those governing ALJ removal restrictions are not so linked. Allowing for proceedings before an ALJ removable at will would not create the type of legal conflict at issue in *Murphy*. That case is thus far less relevant here than *Seila Law* and *Free Enterprise*, both of which addressed severability in the context of Article II removal protection challenges.

In a final fallback argument, Plaintiff suggests that even if ALJ removal restrictions are generally severable, the Court should nonetheless conclude that those restrictions are not severable when it comes to *DOJ ALJs* in particular. *See* Reply at 25. But Plaintiff does not explain why, for purposes of a severability analysis, the Court can focus only on DOJ ALJs. According to Plaintiff,

12

the severability inquiry requires the Court to consider what Congress intended when it enacted the relevant removal provision. *See* Reply at 21-22. Here, the relevant provision, 5 U.S.C. § 7521, generally governs the removal of *all* ALJs, and Plaintiff offers no concrete evidence indicating that the Congress that enacted section 7521 ever intended for different ALJs to be treated differently if the removal restrictions protecting all of them were found unconstitutional.

Regardless, Plaintiff's arguments for why the removal restrictions for DOJ ALJs are non-severable lack merit. For example, Plaintiff argues that Congress required DOJ to use ALJs, thus suggesting that Congress wanted those ALJs to be independent. *See* Reply at 25. To Plaintiff, this means that rendering DOJ ALJs removable at will "would effectively nullify that statutory provision." *Id.* But again, this does not show that, if DOJ ALJs were removable at will, Congress would have preferred to have *no DOJ ALJ proceedings at all*. Eliminating those proceedings would interfere with DHS's ability to enforce several INA provisions, *see* Aguilar Decl. ¶¶ 7-10, which Congress surely did not intend. Further, Plaintiff is wrong to suggest that, absent ALJ removal protections, Congress would have had no reason to require the use of ALJs. There are several reasons Congress would have still done so. For example, requiring ALJ proceedings guarantees those subject to potential penalties under the relevant INA provisions a prompt, formal administrative process by which to submit evidence and arguments challenging those penalties. Congress may have also preferred the use of ALJ proceedings because they are less resource-intensive than proceeding before a federal court. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006) ("Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court."). Furthermore, it is clear that, in requiring DOJ to use ALJs, Congress's chief concern was not ALJ independence. After all, Congress gave the Attorney General the unfettered right to modify any DOJ ALJ final decision. *See* 8 U.S.C. §

1324a(e)(7); 28 C.F.R. § 68.55. Congress's decision to require the use of DOJ ALJs therefore does not support Plaintiff's non-severability argument.

Plaintiff also argues that any disruption caused by disposing of DOJ ALJ proceedings would be "minimal" because Congress can just "enact[] a constitutionally valid scheme." Reply at 25. But it is unclear whether and how quickly Congress would implement a replacement scheme, and in the interim, several INA provisions would have no meaningful enforcement mechanism. *See* Aguilar Decl. ¶¶ 7-10. Further, Plaintiff's argument is inconsistent with *Seila Law*. Congress, in theory, could have enacted a replacement CFPB statute if the Supreme Court had scrapped the CFPB altogether in light of its Director's impermissible removal protections. But the Supreme Court had little trouble finding that the extraordinary relief the petitioner requested was unjustified. *See supra* at 11. The Court should reach the same conclusion here.

Dated:  August 1, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER HALL
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*
KUNTAL CHOLERA
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Kuntal.Cholera@usdoj.gov

JILL E. STEINBERG
UNITED STATES ATTORNEY

*/s/ O. Woelke Leithart*
Idaho Bar No. 9257
Assistant United States Attorney
U.S. Attorney's Office

14

Post Office Box 8970
Savannah, Georgia 31412
Woelke.Leithart@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I am counsel for Defendants. On August 1, 2023, I effected service of the foregoing on opposing counsel by filing it through ECF.

/s/ Kuntal Cholera